**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**J. F. BARNES, James Tubb Washer and
Robert Carney, Defendants-Appellants.**

**No. 17181.**

United States Court of Appeals
Sixth Circuit.

Oct. 7, 1967.

John J. Hooker, Sr., and Harris A. Gilbert, Nashville, Tenn. (Jack Norman, Sr., Harry H. Chitwood, John J. Hooker, Sr., Harris A. Gilbert, Nashville, Tenn., on the brief), for appellants.

Gilbert S. Merritt, Jr., U. S. Atty., Nashville, Tenn. (Gilbert S. Merritt, Jr., U. S. Atty., Lyman R. Patterson, Alfred H. Knitht, III, Asst. U. S. Attys., Nashville, Tenn., on the brief), for appellee.

Before O'SULLIVAN, EDWARDS and McCREE, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Defendants-appellants, J. F. Barnes, James Tubb Washer and Robert Carney, were, as partners, the proprietors of a Nashville, Tennessee, gambling establishment known as the Uptown Dinner Club. This enterprise was conducted for years in violation of Tennessee's antigambling laws, Tenn.Code Ann. Section 39–2032, but seemingly flourished unhampered by prosecution until the federal government indicted the coproprietors under the so-called Interstate Travel Act, 18 U.S.C.A. Section 1952.[1] The misconduct charged in the indictment consisted of entering into a conspiracy (18 U.S.C. Section 371) to use, and causing to be used facilities of interstate commerce—common carriers and the mails—to carry on and promote the operation of the Uptown gambling establishment; the "overt acts" cited by the Government as establishing the conspiracy and the charged substantive violations of the Travel Act were: (a) purchasing various quantities of dice and chips from Chicago and Cincinnnati concerns and having them shipped to Nashville by express, and (b) cashing checks drawn on out-of-state banks and causing a Nashville bank to use the mails to deliver them, for collection, to the out-

---

1. 18 U.S.C.A. Section 1952 reads in part:
   "(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
   *    *    *    *    *    *    *
   (3) otherwise promote, manage, establish, carry on or facilitate the promotion, management, establishment or carrying on, of any unlawful activity, *  * shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
   (b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling *  *  * offenses in violation of the laws of the State in which they are committed *  *."

state drawee banks.[2] By jury verdict, returned November 23, 1965, all defendants were convicted under various counts of the indictment. Their appeal is now before us.

We discuss the claims of error as follows:

I. Convictions of Washer and Carney on conspiracy and substantive counts.

The first count of the indictment charged the defendants with conspiring, from about October 1, 1961, to December 31, 1964, to commit the substantive offenses detailed in counts two through seventeen. Motions of appellants Washer and Carney for judgments of acquittal on all counts were denied. The jury convicted the three defendants on the conspiracy count, the substantive counts relating to the purchase of dice and on two of the counts involving the cashing of checks; it acquitted all defendants on the counts involving the purchase of chips and of three of five counts involving the cashing of checks. The reason for this selectivity by the jury does not readily appear unless it be that they considered chips less identifiable with gambling than dice and because it was not clear whether three of the checks were cashed to cover gambling losses. We are of the view that the motions of Washer and Carney should have been granted.

a. Purchase of chips and dice.

None of the defendants took the stand or offered any proofs. The government's evidence established that over the period in question, and as far back as 1952, the defendants, as partners, carried on a gambling establishment in violation of Tennessee law. Testimony as to the method of the Uptown Club's operation was given by various of its former employees, all local residents in the Nashville area. They agreed that Barnes was the active manager of the business, but that Washer and Carney were in and out of the club and took over for Barnes in his absence; Carney also had an apartment upstairs of the club where he stayed on occasion.

It was further established that the managing partner, Barnes, had on various dates in 1964 purchased quantities of dice and chips from business houses in Chicago and Cincinnati. But there was no evidence that Carney or Washer had anything to do with, or had any knowledge of, Barnes' outstate purchases of these items. Representatives of the Chicago and Cincinnati firms testified that all the orders for the gambling parpahernalia were placed with them by Barnes, that the shipments were made to Barnes via Railway Express, and that their accounts were paid by him; they claimed they did not know his partners, Washer and Carney.

There was no evidence that a practice of outstate purchasing had existed prior to February 29, 1964, the first such purchase cited in the indictment. And although a large number of dice and chips were acquired subsequently in 1964, there was no evidence that the involved shipments made up the club's supply of these items. There was nothing to tell whether some of them were resold at retail or otherwise or were taken as souvenirs by the patrons of the club. There was no evidence of any need for Barnes to go out of Tennessee to purchase dice and chips, and it is a reasonable assumption that the state of Tennessee has an ample supply of such devices for sale.

Although the government apparently had access to the books and other records of the partnership, with which Washer and Carney could be assumed to have been familiar, none that were introduced disclosed the interstate character of any shipments of dice or chips. Partnership

2. While the described conduct does not indicate that the proprietors of the Uptown Club were a part of the interstate octopus of "organized crime" or members of the "Syndicate," the destruction of which was the objective of the Travel Act (see Judge Talbot Smith's discussion of its legislative history, United States v. Azar, 243 F.Supp. 345, 347–348 (E.D.Mich.1964)), the defendants could be found guilty if their doings were condemned by the letter of the Act.

income tax returns of the Uptown Club (prepared by an accountant and signed only by Barnes) for the years 1963 and 1964 were introduced, and showed the 1963 net income of the club to be $164,816.00, each partner's share being $55,000.00; in 1964 the share of each partner was approximately $16,000.00. But these returns, while giving an impression of the size of the operation, again, provided no proof as to the alleged use of interstate facilities by Carney and Washer, or knowledge or expectation by them of Barnes' outstate purchases.

### b. Cashing of Checks.

The government charged that the defendants were guilty of violating the Travel Act, and conspiring to violate it, by cashing patrons' checks, drawn on outstate banks, and having the First American National Bank of Nashville use the mails to effectuate collections from the drawee banks. The checks involved in the two counts upon which convictions were obtained totaled $250.00. We assume that the evidence introduced in this respect also contributed to the conviction of the defendants on the conspiracy charge.

Patrons of the Uptown Club from time to time cashed checks at the club. Club employees stated, however, that before any check could be accepted, it had to have the approval of one of the three partners. Although there was testimony that Washer and Carney did on occasion handle customers' checks, there was no evidence that either of them had approved or cashed the particular checks cited in the indictment, or any other outstate checks; nor was there any evidence that either of them delivered any such checks to the Nashville bank for collection. Only Barnes' name appears on them, as an endorser, and it may be assumed that he was the party who cashed them.

The five transactions involving checks were confined to the month of November, 1964. There was no testimony as to the approximate percentage of patrons frequenting the club who resided outside the state of Tennessee and hence might be expected to cover gambling losses with checks drawn on out of state banks. It was stipulated that appellants Washer and Barnes had for some years maintained a joint savings account at the First American National Bank at Nashville to facilitate the cashing of checks brought there from the Uptown Club; that any checks returned for insufficient funds were to be charged against the account. It was also stipulated, however, that there had "been nothing charged against it."

### c. Discussion of evidence.

■ We do not believe, considering the above, that the government met its burden of offering evidence from which a jury could find beyond a reasonable doubt that Carney and Washer conspired with Barnes, or were either principals or aiders and abettors with him in his purchasing gambling paraphernalia from outstate sources, or in employing interstate facilities to cash the checks drawn on out of state banks.

It is apparent, of course that all of the defendants were active partners in carrying on an enterprise which violated the criminal statutes of Tennessee, but such criminal conduct was but necessary background to the federal offenses for which they were tried. Federal crimes were what the government had to establish.

In its attempt to support the conviction on the conspiracy count the government says to us that an agreement to use interstate facilities need not be overt, but may be inferred from circumstantial evidence. The government points out that the defendants had been closely associated with each other in the gambling business for years, and assert that it would be naive to suppose that Washer and Carney did not know of, and had not agreed to, Barnes' use of interstate facilities in connection with the enterprise; it insists that in a business on the scale of the Uptown Club, it was inherently improbable that interstate facilities would not be used to acquire supplies and to cash checks. This approach is

also used by the government in asking affirmance of convictions on the substantive counts as well:

> "The defendants' argument that there was insufficient evidence to convict defendants Washer and Carney on the substantive counts of the indictment overlooks the basic fact of the case; all of the defendants were partners in the conduct of a gambling business in violation of state law and in the operation of which interstate facilities were used. Theirs was not only a partnership in business; *it was a partnership in crime,* and defendants Washer and Carney were not aiders and abettors, as contended by defendants, but co-conspirators." (Emphasis supplied)

■ We may assume that if the purchase of supplies through interstate commerce, or the cashing of checks by use of a facility of interstate commerce, were essential to or shown to be usual in the business of a local gambling enterprise, or if Carney and Washer had reason to expect or knew that the partnership manager was so employing facilities of interstate commerce, they could be found guilty. This would be true, as the government says, without direct evidence, if there was circumstantial evidence from which an inference of the requisite facts could be made, and on this appeal the government's evidence and inferences therefrom must be viewed most favorably to it. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 88 L.Ed. 680, 704 (1942). But the inferences must be justifiable ones, and mere suspicion that Washer and Carney must have known, or reasonably could have been expected to know, about Barnes' conduct will not suffice. Cf. United States v. Berkley, 288 F.2d 713 (CA 6, 1961), cert. den. 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27.

The purchase of paraphernalia in order to run an illegal gambling establishment is not on its face a federal offense. Undoubtedly supplies were available in Tennessee, and the mere knowledge by Carney and Washer that Barnes was acquiring dice and chips for use in the club did not also charge them with knowledge that he was bringing them in from outstate. He made all the purchases in his own name, and the sellers involved in the transactions had never heard of the other partners. Nothing appeared in the partnership records introduced by the government which would put Washer and Carney on notice that some of the club's equipment was being acquired from someplace outside Tennessee.

Similarly as to the checks drawn on out of state banks. We may assume that the Uptown Club on occasion enjoyed the patronage of outstate visitors to Nashville, and that many who buy food and drink and join in the gambling at such a spot have need to cash checks. It might be surmised, also, that Carney and Washer cashed some outstate checks while they were in charge, but there was no such proof. There was no evidence that it was part of the normal operation of such an enterprise as the Uptown Club to cash outstate checks. Therefore, this had to be inferred without proof. There was no evidence that Carney or Washer knew of the cashing of the two checks by Barnes for which they, with him, were convicted. This, therefore, also had to be inferred.

The joint savings account maintained by Washer and Barnes (not the partnership) to protect the bank against bad checks, adds nothing of probative worth to the government's case. It was begun in 1951, long before the Travel Act became law. Its beginning did not offend any federal statute and could not have been any part of a conspiracy to violate the Travel Act, or any other federal statute. From its beginning in 1951, "there's been nothing charged against it."

■ The Federal Travel Act, enacted in 1961, was a relatively new effort by the federal government to attack interstate gambling where local authorities failed to act. Assuming that Washer and Carney knew of the Act and that cashing outstate checks would violate it, they could have avoided doing so themselves and forbidden Barnes to do so; but he

could possibly have acted contrary to their instructions. This is, of course, also surmise. There is no evidence that any of the partners knew that the Travel Act could make a local enterprise a federal offense by the mere cashing of an outstate check, whether for food and drink partaken at the club or for gambling. This lack of knowledge would not excuse one who actually committed the overt act, United States v. Miller, 379 F. 2d 483 (CA 7, 1967), see also United States v. Hawthorne, 356 F.2d 740, 742 (CA 4, 1966), cert. den. 384 U.S. 908, 86 S.Ct. 1344, 16 L.Ed.2d 360, United States v. Gris, 247 F.2d 860, 864 (CA 2, 1957), nor would it excuse copartners who reasonably could be expected to know of the commission of the forbidden acts by their copartner.

We construe the government's position to be, virtually, that all partners in one illegal activity—here a gambling establishment offensive to state law—will be criminally responsible for the conduct of any copartner which offends another criminal statute—here a federal one—even though such criminal conduct was not shown to be necessary or usual to the partnership or known to the copartners. We are not dealing with a civil rule which holds generally that all partners are bound by the acts of any copartners done within the apparent scope of authority to serve partnership purposes. It might aid the financial success of an illegal gambling enterprise for a managing partner to steal the purse of a patron, to bribe a police officer, or to falsify the tax reports of the partnership; but we do not believe that all copartners could be prosecuted for such crimes if they had no knowledge of them, and had not conspired to bring them about, even though their commission may have served, but was no part of, the objectives of or the motivation for the admittedly illegal partnership enterprise.

We consider that Twitchell v. United States, 313 F.2d 425 (CA 9, 1963), supports the view we express. In that case violations of a federal statute—the Mann Act (18 U.S.C. Section 2421, Section 2422)—were charged as the object of a conspiracy between a venal sheriff and the operators of several houses of prostitution. The operation of the houses of prostitution and the protection of them by the sheriff in exchange for "pay-offs" was clearly violative of state law. There was evidence also that one or more of the alleged conspirators had transported or procured the transportation in interstate commerce of girls to work in the houses of prostitution.

There was no question but that there was a conspiracy, to which the sheriff was a party, to violate state law. In considering whether the evidence was sufficient to establish *by inference* that the sheriff knew that illegal transportation was a part of the conspiracy to which he agreed, the Court said,

"It is not a violation of that Act [the Mann Act] to employ, in a house of prostitution, women who have come from other states of their own accord, even if their purpose in coming was to indulge in prostitution. (See McGuire v. United States, 8 Cir., 1945, 152 F.2d 577, 579–580.) Thus proof, *of which there is a circumstantial modicum in this case,* that Twitchell knew that some of the girls in the houses that he was protecting came from out of state, is not enough." 313 F.2d at 429. (Emphasis supplied.)

and then went on to assert the sort of proof necessary to bring the sheriff Twitchell into a conspiracy to violate federal law.

"We think that, in a case of this kind, the evidence must show in relation to Twitchell that either:

"1. he *directly* agreed to the illegal interstate transportation, or *directly* agreed to a scheme which could not be consummated without illegal interstate transportation, or *directly* agreed to a scheme in which it was known that the liklihood of illegal interstate transportation was *great* (it being understood that such agreement need not be overt, and may be inferred from circumstantial evidence; and that directness refers not to face-to-face

dealings, but to the extent of his knowledge of the purpose and scope of the conspiracy) ; *or*

"2. he evidenced his indirect agreement by substantial participation in the scheme with *actual knowledge* of the proposed, or completed, illegal interstate transportation." Ibid. (Emphasis in original.)

After reviewing the government's evidence the Ninth Circuit went on to say:

"We are of the opinion * * * that this evidence is not sufficient, however great a *suspicion* as to Twitchell's knowledge it may raise, to constitute *proof* of the offense here involved. The basic conspiracy, which the government spent a great deal of time proving, was not a conspiracy to commit federal offenses, with which Twitchell was charged. Some of the coconspirators may have intended to import out of state girls, and may have done so. But the basic conspiracy could have been carried out without these activities, and we do not think that the evidence sufficiently ties Twitchell in with a participation in, or a knowledge of or a purpose to commit the federal offenses that must be shown to be an object of the conspiracy." Ibid. (Emphasis in original.)

The conviction of the sheriff was reversed. The case is relevant here. See also Ingram v. United States, 360 U.S. 672, 677–678, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959).

■ We think, that while presumption of innocence and the government's burden to prove intentional criminal conduct beyond a reasonable doubt must primarily be guides to the fact finders, we do not ignore these great commands in weighing the sufficiency of the evidence to permit a jury to pass upon the guilt of an accused. Whatever suspicions or speculations might be indulged that the Uptown Club was in fact part of "the syndicate," the destruction of which was part of the Congressional purpose in enacting the Federal Travel Act, and that Carney and Washer knew of and conspired in the illegal doings of Barnes, such suspicions, speculation and surmise are not sufficient to sustain their conviction. United States v. Berkley, supra, 288 F.2d at 717. In United States v. Dunn, 299 F.2d 548, 554–555 (CA 6, 1962) we had occasion to say:

"The additional evidence against Dunn might well arouse suspicion and support a speculative conclusion of his guilt. Indeed it might lead to sophisticated surmise that he was the inspiration of the claimed criminal plan. Such speculation, however, is not sufficient to sustain a judgment of conviction. United States v. Berkley, 288 F.2d 713, 718 (CA 6, 1961); Moore v. United States, 271 F.2d 564, 568 (CA 4, 1959); Guevara v. United States, 242 F.2d 745, 747 (CA 5, 1958); Wise v. United States, 241 F.2d 545, 547 (CA 5, 1957)."

■ We reverse the convictions of Carney and Washer under the conspiracy and substantive counts. We likewise reverse the conviction of Barnes under Count I, the conspiracy charge; Barnes could not be convicted of conspiring with himself to violate the Act, and there was no attempt to prove that he conspired with anyone other than Washer and Carney. Relevant, however, to the appeal of Barnes, we must consider the following:

II.   Prejudicial publicity and argument.

During the progress of the trial the District Attorney sought to introduce testimony of a witness named Gallico, a New Yorker, who allegedly cashed a check at the Uptown Club in August, 1965, a date eight months subsequent to the events charged in the indictment. The District Judge, after objection and some colloquy, excused the jury and further discussion was had in their absence. Ultimately the government withdrew the proffered Gallico testimony for presentation at that time. There followed, however, newspaper and T.V. announcements of what went on outside the presence of the jury. The Nashville Banner under large lead headlines "Witness is 'Sur-

prise'," "Special Session Ordered," and "Gambling Case Continuing," reported in part as follows:

"Federal District Judge William E. Miller was to conduct an extraordinary afternoon session today to hear the testimony of a government witness who allegedly gave a false statement to FBI agents concerning gambling activities at the Uptown Dinner Club in Printers Alley.

"The session, requested by U. S. Atty. James F. Neal, was to begin at 2:30 p. m. with the testimony of Al Gallico of New York.

"Neal, chief prosecutor in the interstate gambling trial of the club's three operators, said, *'This man is frightened * * * and needs to return home.'*

"Attorneys for James F. Barnes, James T. Washer and Robert Carney vigorously objected to the session and asked for an overnight adjournment to 'research this issue and confer with our clients.'

\*    \*    \*    \*    \*    \*

"The prosecutor said, 'We will prove by this witness that he gambled on August 11, 1965 at the Uptown Club and lost some money. He wrote a check on an out-of-state bank to get money to cover his gambling losses.

"The witness will testify that one of these defendants endorsed this check with the name of James Swor—*a mysterious, false name.'*

"Neal, questioned by the defense as to the identity of the defendant, replied, 'Well, I'll tell you then, it's Mr. Carney.'

"This was the first time in the two-day trial that Carney's name has been mentioned in connection with cashing of checks at the club. *The name of Barnes has appeared on other checks written on out-of-state banks at the establishment, according to Neal."* (Emphasis supplied)

Nashville television station WLAC-TV also gave its report of the doings on the day of the Gallico affair, and the next morning the Nashville Tennessean ran a shorter and less colorful account thereof.

When the trial resumed counsel for defendants moved for a mistrial. The motion was denied. The District Judge questioned the jurors as a group and three of them told of having read the newspaper accounts or heard the telecast, but gave assurances that they would not be affected thereby. It should be mentioned that the jurors were allowed to return to their homes each night and, prior to the publicity of the Gallico incident, no admonition had been given to them to refrain from reading newspapers or watching television coverage of the trial.

The claim of prejudicial argument arises from the following: None of the defendants took the stand nor presented any evidence in their own behalf. At the beginning of the District Attorney's argument to the jury, he included the observation that:

" * * * the defense counsel may argue at great length, because they rested, of course, without calling a witness."

Upon objection, the District Judge forbade further comments of this nature and instructed the jury to disregard the statement and to draw no inferences therefrom, and emphasized that the defendants had the right not to call any witnesses. Defendants' motion for mistrial was denied.

All the defendants charge that a new trial should be granted, relying primarily on Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) and Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed. 1250 (1959) as to the newspaper and TV publicity, and upon Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84, (1961), as to the prosecutor's reference to the defendants' failure to put in any evidence. Arguing that each of these matters were sufficient to call for a new trial, they insist that in any event, taken together, they require such a ruling. United

States v. Ornstein, 355 F.2d 222, 225 (CA 6, 1966).

■■ Inasmuch as we are directing judgments of acquittal as to Carney and Washer, consideration of the present questions is not necessary as to them. We consider these issues only as to appellant Barnes. The allegedly prejudicial publicity and argument here relied upon cannot be compared in magnitude and kind with what was considered in *Sheppard, Marshall* or *Stewart*, supra. But we believe we do not need to discuss the reach of these decisions in the case before us. We are not persuaded that the described events prejudiced or affected substantial rights of appellant Barnes. Error, if there was such in denial of mistrial, was harmless. Rule 52(a), F.R.Crim.P. While generally we do not consider the guilt or innocence of an accused in assessing allegations of constitutional deprivation, United States v. Vida, 370 F.2d 759, 764 (CA 6, 1966), we think that in the situation here we are at liberty to consider the uncontraverted evidence presented against Barnes in determining whether he was hurt by the events under discussion. There can be no dispute but that he violated the Federal Travel Act by ordering the gambling devices from outstate sources, and by endorsing and presumably cashing checks drawn on out of state banks. We are confident that we are able to declare, "beyond a reasonable doubt," that the asserted errors, if they were such, were harmless in nature. Chapman v. State of California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

III. Separation of jurors during deliberations.

■ There was no objection to the trial judge's decision to allow the jurors, during their deliberations, to separate overnight and return home. Without commenting on the merits of the rule expressed in the Seventh Circuit, see United States v. D'Antonio, 342 F.2d 667 (CA 7, 1965) and United States v. Panczko, 353 F.2d 676 (CA 7, 1965), cert. den. 383 U.S. 935, 86 S.Ct. 1066, 15 L.Ed.2d 853, we will not, in the circumstances before us, employ Rule 52(b) F.R.Crim.P. to find plain error in the trial judge's conduct.

IV. Constitutionality of Travel Act.

■ In United States v. Compton, 365 F.2d 1, 3 (CA 6, 1966) cert. den. 385 U.S. 956, 87 S.Ct. 391, 17 L.Ed.2d 303, we sustained the constitutionality of the Travel Act. We are not persuaded to here depart from that holding.

The convictions of all defendants under count one, the conspiracy count, is reversed and a judgment of acquittal directed; the convictions of Carney and Washer on the substantive offenses charged in counts two, five, six, seven, eight, nine, ten, twelve, thirteen and fifteen are set aside with direction to enter judgment of acquittal as to them. The judgment of conviction of J. F. Barnes as to all counts except count one is affirmed.

EDWARDS, Circuit Judge (concurring in part and dissenting in part).

I concur with the opinion of the court for the reasons stated therein, with the exception of the reversal of the conspiracy counts. As to the conspiracy counts, I would affirm all three convictions.

The three defendants were partners in the operation of a large illegal gambling enterprise in Nashville, Tennessee, for thirteen years. While defendant Barnes was the manager, the testimony clearly shows that when he was absent, defendants Washer and Carney substituted for him as acting manager. Defendant Carney had an apartment on the premises. We do not need to decide whether these facts alone were sufficient to allow a jury to infer that defendants Washer and Carney knew or should have known that the gambling partnership through manager Barnes was purchasing gambling supplies and cashing checks in interstate commerce in violation of the Interstate Travel Act, 18 U.S.C. § 1952.

Defendant Washer had also participated with Barnes in setting up a savings

account which served for ten years as a guarantee for checks cashed by the gambling partnership. Defendants Washer and Carney from time to time as acting managers cashed checks for patrons of the gambling club.

The prosecution proved that two checks were cashed in interstate commerce by Barnes while the check cashing guarantee was in existence. The evidence discloses no limitation on the use of the guarantee. Washer and Carney were not shown to have specific knowledge of these two checks.

On these facts I believe the jury had the right to view Barnes as a fully authorized agent of defendants Washer and Carney in cashing the two checks and to find that all three had knowingly engaged in a conspiracy (See 18 U.S.C. § 371) to violate the Interstate Travel Act.

Barnes' illegal acts in cashing the two interstate checks were wholly natural and foreseeable acts which defendants Washer and Carney were bound to anticipate under the circumstances which they had joined in creating. Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

In *Pinkerton* the Court said:

"It is settled that 'an overt act of one partner may be the act of all without any new agreement specifically directed to that act.' United States v. Kissel, 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168. Motive or intent may be proved by the acts or declarations of some of the conspirators in furtherance of the common objective. Wiborg v. United States, 163 U.S. 632, 657–658, 16 S.Ct. 1127, 1197, 41 L.Ed. 289." Pinkerton v. United States, 328 U.S. 640, 646–647, 66 S.Ct. 1180, 1184 (1946).

In Blumenthal v. United States, the United States Supreme Court said concerning the evidence required to support a conspiracy conviction:

"Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity." Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947) (Footnote omitted).