**UNITED STATES of America,
Appellee,**

v.

**Louis Gustav LeFAIVRE et al.,
Appellants.**

**No. 74–1239.**

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 30, 1974.

Decided Dec. 4, 1974.

Certiorari Denied March 31, 1975.

See 95 S.Ct. 1446.

---

13. See note 8 *supra*.

14. *See* note 3 *supra*.

Marvin J. Garbis, Baltimore, Md. (Allen L. Schwait and Garbis & Schwait, Baltimore, Md., on brief) for appellants.

James A. Rothschild, Atty. U. S. Dept. of Justice (George Beall, U. S. Atty., William A. Pope, Sp. Atty., Baltimore Strike Force, Baltimore, Md., and Jerome M. Feit, Atty. U. S. Dept. of Justice, on brief) for appellee.

Before CRAVEN, BUTZNER, and FIELD, Circuit Judges.

CRAVEN, Circuit Judge:

This appeal presents an interesting aspect of federalism: to what extent should the United States participate with the states in the attempt to control human behavior by the imposition of criminal sanctions. Tradition and history assign a subordinate role to the United States. The burden of policing behavior by application of criminal law remains heavily upon the states, and the proper role of the United States has been termed ancillary or auxiliary to that of the states. *See* 1 National Commission on Reform of Federal Criminal Laws, Working Papers 33–36 (1970). Nevertheless, Congress by various statutes has made possible federal prosecution of a great many crimes that seem to have little or no correlation to traditional federal interests. *See, e. g.,* Mann

Act, 18 U.S.C. § 2421 (1970); Dyer Act, 18 U.S.C. § 2312 (1970).

The statute involved here is 18 U.S.C. § 1952, sometimes known as the "Travel Act," and entitled by the Congress "Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises." It represents the most extensive recent entry by the Congress into the substantive criminal law field. Pegged upon the congressional power over interstate and foreign commerce and the mails, the statute undertakes to make federal crimes out of business enterprises that involve gambling, non-taxpaid liquor, narcotics, prostitution, extortion, bribery, and arson.

We are here concerned with gambling. Appellants were convicted by a jury of participating in varying degrees in a rather large gambling operation[1] conducted entirely within the State of Maryland and mostly within the City of Baltimore. Appellant Louis LeFaivre, Sr., was the backer for the entire operation; appellant Louis LeFaivre, Jr., was one of his lieutenants; and appellants Miller and Eckert were "telephone girls" who recorded daily bets taken by the "writers" located throughout the city. Some of the many "writers" received as much as $1,000 or even $2,000 in bets weekly. But the only established connection with interstate commerce, the jurisdictional peg for application of the statute, was the introduction at trial of 14 out-of-state checks and other negotiable instruments offered in settlement of bets and passed through interstate banking channels in the clearing process aft-

er being cashed or deposited by one of the principal defendants.

Not unreasonably, appellants characterize their gambling enterprise as "local" as opposed to interstate. They urge on appeal that the Travel Act was not intended to apply and does not apply to a local gambling operation with only incidental use of facilities in interstate commerce. We disagree. Appellants' arguments come to this: that the Congress in the exercise of its power over the instrumentalities of commerce ought not to undertake to reach criminal activity that is primarily local in nature, but should instead leave policing of such criminal activity to the states.[2] We think the argument is addressed to the wrong forum and that it is not for the courts to interpose restraints so long as the Congress has acted within the proper scope of its powers.[3] The convictions will be affirmed.

## I.

The language of the Travel Act literally covers this gambling operation involving 14 out-of-state negotiable instruments. In relevant part, the Act states that "[w]hoever . . . uses any facility in interstate or foreign commerce, including the mail, with intent to . . . carry on, or facilitate the . . . carrying on, of any unlawful activity [gambling], and thereafter performs or attempts to perform [any business enterprise involving gambling] shall be fined not more than $10,000 or imprisoned for not more than five years,

---

[1]. The indictment charged that during the years 1968, 1969, and 1970, LeFaivre (or other defendants) cashed checks and other negotiable instruments totalling approximately $1,500,000. This figure is an indication of the size of the LeFaivre operation.

[2]. The issues as framed by appellants are these, with our answers bracketed:
1. Does 18 U.S.C. § 1952 (The Travel Act) apply to a local gambling operation where the use of interstate facilities was, at most, the cashing of fourteen checks drawn on out of state banks? [Yes]

2. Under 18 U.S.C. § 1952 must the use of interstate facilities be more than minimal or merely incidental to a local gambling operation? [No]
3. Under 18 U.S.C. § 1952 is knowledge or intent regarding the use of interstate facilities required to any degree? [No]

[3]. There is no constitutional issue presented on appeal. Since it is assumed that Congress acted within its power we need not concern ourselves with the extent of such power.

or both.[4] The words fit the facts of this case: LeFaivre *used* facilities in interstate commerce each time he deposited or cashed one of the 14 out-of-state checks received from his writers. His intention was to collect money and thus to *carry on or facilitate the carrying on* of his enterprise. And since the gambling operation was ongoing over a period of years, there can be no doubt that LeFaivre and the others continued to perform their illegal activity *after* the use of interstate facilities, thus meeting the Act's requirement that a person engage in the substantive offense following the involvement of interstate commerce.

In United States v. Wechsler, 392 F.2d 344 (4th Cir.), cert. denied, 392 U.S. 932, reh. denied, 393 U.S. 902, 89 S.Ct. 71, 21 L.Ed.2d 191 (1968), we upheld a Travel Act conviction founded upon a local zoning board official's deposit into his bank account of an out-of-state check received as a bribe. As we said then, "[w]hen one deposits a check, there would seem to be little doubt that he is using a facility in interstate commerce."[5]

392 F.2d at 347 n. 3; cf. United States v. Barnes, 383 F.2d 287, 290 (6th Cir. 1967), cert. denied, 389 U.S. 1040, 88 S.Ct. 780, 19 L.Ed.2d 831 (1968). In United States v. Salsbury, 430 F.2d 1045 (4th Cir. 1970), a Maryland nightclub operator financed large-scale illegal gambling operations in which bettors often paid their bookies by check or money order, which the nightclub operator cashed at a local drugstore. We held the government could prosecute Salsbury under the Travel Act because some of the checks were on out-of-state banks.

But appellants urge that *Wechsler* and *Salsbury* have been destroyed by Rewis v. United states, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). In *Rewis*, the Supreme Court held that the Travel Act could be applied neither to persons who crossed state lines for the purpose of frequenting a local gambling establishment, nor—considering solely the fact of their customers' travel across state lines—to the operators of the establishment. Appellants rely on the discussion in *Rewis* of the legislative history behind the Travel Act, which they argue suggests that Congress did not in-

4. The statute reads in full as follows:

*Interstate and foreign travel or transportation in aid of racketeering enterprises.*

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which

they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

(c) Investigations of violations under this section involving liquor shall be conducted under the supervision of the Secretary of the Treasury.

18 U.S.C. § 1952 (Supp.1974).

5. The Seventh Circuit has recently taken issue with this statement from *Wechsler*. In United States v. Isaacs, 493 F.2d 1124, 1149 (7th Cir. 1974), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974), that court stated its disagreement with the statement "because it suggests that the check need not actually travel interstate." The court pointed out that the statute explicitly requires some actual use of an interstate facility *for the purpose of* interstate travel or an interstate transaction, rather than merely the use of an interstate facility for an *intra*-state purpose. 493 F.2d at 1149 n. 1. We acknowledge the ambiguity, and agree that there must be some utilization of a facility in an *inter*state transaction to invoke the Travel Act.

tend to reach purely local operations like LeFaivre's. The Court in *Rewis*, while noting that legislative history of the statute was "limited," did divine from it that the Act was aimed "primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another." 401 U.S. at 811, 91 S.Ct. at 1059. The Court also noted that the legislative history evidenced no consideration by Congress of the effect on "sensitive federal-state relationships" and "limited federal police resources" that would result if the Act were read to cover local gambling operations, even those located in multi-state metropolitan areas, just because they were frequented by out-of-state customers. *Id.* at 812, 91 S.Ct. 1056.

In addition to *Rewis*, appellants also cite us to later decisions of the Seventh and Second Circuits applying *Rewis*. In United States v. Altobella, 442 F.2d 310 (7th Cir. 1971), the Seventh Circuit reversed a Travel Act conviction based on an extortion victim's payment with funds procured by cashing an out-of-state check, which like the checks in the instant case had to travel in interstate commerce in order to be cleared. The Seventh Circuit based its decision in part on the "minimal and incidental" nature of the involvement of interstate facilities, stating that it did not believe Congress intended "to authorize federal intervention in local law enforcement in a marginal case such as this." 442 F.2d at 315, 316. One month after *Altobella*, in United States v. McCormick, 442 F.2d 316 (7th Cir. 1971), the Seventh Circuit reaffirmed its reading of the Travel Act in a short per curiam opinion reversing the conviction of a lottery operator who,

although he actually employed only local people, did advertise for employees in a newspaper that reached some out-of-state subscribers. The court based this decision on *Rewis* and *Altobella*, noting only that "[t]he role played by the interstate mailings was 'a matter of happenstance' and 'minimal and incidental' to the operation of the illegal lottery." 442 F.2d at 318.

The final post-*Rewis* opinion relied upon by appellants is that of Judge Friendly in United States v. Archer, 486 F.2d 670 (2d Cir. 1973), reh. denied, *id.* at 683 (per curiam).[6] The facts in *Archer* presented a rather unpretty picture of government investigators using the ruse of a planted agent to induce suspected criminals into committing overt acts for which they could be charged. The Travel Act was said to be invoked by a single telephone call placed by a government agent from Paris and received by one of the suspected criminals in New York. After examining the legislative history of the Travel Act at length and considering the *Rewis, Altobella,* and *McCormick* decisions, the Second Circuit decided that the telephone call could not support a Travel Act prosecution, both because the call's transatlantic nature was "a matter of happenstance," *see Rewis,* 401 U.S. at 812, 91 S.Ct. 1056, and because the receipt of an interstate or international phone call seemed analogous to the receipt of gambling customers across state lines that the Supreme Court in *Rewis* had held to be insufficient for invocation of the Act. 486 F.2d at 682–683.

■ Appellants contend that the *Altobella, McCormick* and *Archer* decisions, correctly explicating *Rewis,* have applied a judicial gloss to the literal

---

**6.** In their reply brief appellants also cited us to United States v. Isaacs, 493 F.2d 1124 (7th Cir. 1974), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1973). In *Isaacs*, the government based its prosecution under the Travel Act on the travel in interstate banking channels of three checks received by participants in a bribery scheme and deposited by them at their local banks.

Relying on its reading of *Rewis, Altobella,* and *McCormick,* the Seventh Circuit in *Isaacs* concluded that the use of interstate facilities was "so minimal, incidental, and fortuitous, and so peripheral" to the activities of the participants in the bribery scheme that the Act could not be applied. 493 F.2d at 1146.

words of the Travel Act that merits our adoption and compels reversal of their convictions in this case. They contend that we, like the Seventh and Second Circuits,[7] should require a *substantial* and *integral* involvement of interstate facilities in an illegal activity, as opposed to a purely *minimal* and *incidental* involvement, before we uphold a prosecution under the Act. From a policy standpoint they argue that adoption of such a distinction would have the salutary effect of limiting coverage of the Act to organized crime involving several states, where local law enforcement officials are hindered by the very scope of the operations, and leaving more local activities to the local authorities. Of more immediate concern to appellants than the policy argument, no doubt, is the fact that such a distinction would also make it impossible to uphold their convictions, since the number of out-of-state instruments involved in LeFaivre's operation was apparently minimal relative to the volume of business conducted, and their involvement at all was arguably fortuitous and incidental, and certainly not vital to the operation of the gambling enterprise.

Assuming for the moment that the post-*Rewis* decisions relied upon by appellants were correctly decided, we believe each can be readily explained by factors having nothing to do with a narrow or restricted reading of the Travel Act. In *Altobella,* the Seventh Circuit based its decision in large part upon the absence of any significant criminal activity transpiring *after* the use of interstate commerce channels, an explicit requirement of the Travel Act on its face. 442 F.2d at 314–315. In our case, an ongoing gambling enterprise, there was significant criminal activity following

each use of facilities in interstate commerce.

The *Archer* court focused on what it considered the despicable police maneuver of planting an agent to initiate a monitorable criminal scheme. It came close to reversing the convictions solely on the ground of "government lawlessness" as defined in Justice Brandeis' famous dissent in Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928). *See* 486 F.2d at 674–677. Backing off from that ground of decision, the court ultimately based its reversal on insufficient use of interstate channels to bring the Travel Act into play. But on the government's petition for rehearing, the Second Circuit panel in a per curiam statement explained its decision in very narrow terms:

> While the Government professes alarm at the precedential effect of our decision, we in fact went no further than to hold that when the federal element in a prosecution under the Travel Act is furnished solely by undercover agents, a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves and that this was not met here.

486 F.2d at 685–686. That can be read to mean that the *Archer* opinion was virtually withdrawn. But in any event, that decision is distinguishable from the instant case on either of two grounds: the unsavory police practices that colored that decision, or the government initiation of the interstate aspect of the criminal activity, neither of which we have on the record before us.

In *McCormick* the government based its Travel Act prosecution on the defendant lottery operator's advertisement

7. *See also* United States v. Vitich, 357 F. Supp. 102, 104 (W.D.Wis.1973), where Judge Doyle interpreted the *Altobella* and *McCormick* decisions as follows:

> From these decisions it appears that there are two predominant factors bearing on the question whether the interstate activities of an unlawful operation bring it

within the ambit of the Travel Act: (1) the significance of the role of the interstate activity in the unlawful operation; (2) whether the use of interstate facilities was a matter of happenstance or a conscious decision on the part of the defendant.

for lottery salesmen in a local newspaper that had some out-of-state subscribers. But the defendant in fact employed no salesmen from out-of-state, and it is arguably true that he did not "use" the interstate aspect of the newspaper. In our case, LeFaivre did, of course, benefit from the use of interstate banking channels.

The precise factual settings of the Second and Seventh Circuit decisions raise some doubt as to whether, in an ordinary case, those circuits would read into the Travel Act a requirement of "substantial and integral" involvement in interstate commerce. It is possible those cases may be confined to their facts. If not, we decline to follow them and reject any narrowly restrictive reading of the Act.

We reiterate that the facts bring this case squarely within the *plain language* of the Travel Act. The Congress chose to trigger application of the Travel Act by the use of "any facility in interstate or foreign commerce." It did not provide that such use must be "substantial" nor, so far as we can ascertain, has it ever done so in any other federal criminal statute pegged to the use of interstate facilities. The Congress did not exclude from application of the statute the use of facilities in commerce that might be termed "minimal and incidental," nor has the Supreme Court done so, we think, in *Rewis*. However desirable it may seem to curb the reach of this

criminal statute, *see Archer, supra,* 486 F.2d at 677–678, we think we lack the power to do so. Once it is determined that the Congress has acted constitutionally and within the scope of its powers (and that is here conceded), and that its statute reaches given activity, we think the inquiry must come to an end.

We are, of course, bound by any construction put upon a statute by the Supreme Court; but we discern none in *Rewis* that prevents application of the Travel Act to these appellants. Mr. Justice Marshall's opinion for the Court does discuss legislative history and federalism in terms that suggest the Act should not be read to cover every situation it could *conceivably* reach. But he spoke in the context of a fact situation that would have required *extending* the coverage of the Act *beyond* its literal language:

> [W]e are unable to conclude that conducting a gambling operation frequented by out-of-state bettors, by itself, violates the Act. Section 1952, prohibits interstate travel with the intent to "promote, manage, establish, carry on, or facilitate" certain kinds of illegal activity; and *the ordinary meaning of this language* suggests that the traveler's purpose must involve more than the desire to patronize the illegal activity.

401 U.S. at 811, 91 S.Ct. at 1059 (emphasis added).[8] Having determined that the *plain language* did *not* cover the sit-

---

8. Justice Marshall's concern with the purpose of the *bettors* in traveling interstate, when he was in fact dealing with the convictions of the *gambling establishment operators*, requires a brief explanation. The government in *Rewis* had originally prosecuted both the bettors who traveled interstate and the operators who received them. Only the bettors themselves could be prosecuted directly under the Travel Act, however, since owners of the gambling establishment did not travel interstate or use interstate facilities. In order to prosecute the establishment owners, the government relied upon 18 U.S.C. § 2, the general aiding and abetting statute, on the theory that the establishment owners were aiding and abetting the Travel Act violations of those who traveled inter-

state to their establishments. The Fifth Circuit reversed the convictions of the bettors under the Act, see 418 F.2d 1218, and the Supreme Court in *Rewis* summarily affirmed that action, stating simply that "it cannot be said, with certainty sufficient to justify a criminal conviction, that Congress intended that interstate travel by mere customers of a gambling establishment should violate the Travel Act." 401 U.S. at 811, 91 S.Ct. at 1059. In considering the establishment operators' convictions, however, Justice Marshall still had to focus on the travel of the bettors, since the aiding and abetting convictions of the operators were derivative of the alleged violations by the bettors. Thus the focus on the bettors' travels in the language quoted in the text.

uation in *Rewis,* Mr. Justice Marshall then launched into his discussion of legislative history and federalism, so heavily relied upon by appellants here. At the conclusion of that discussion he summed up: "In short, *neither statutory language nor legislative history* supports such a broad-ranging interpretation of § 1952 [as urged in *Rewis*]." *Id.* at 812, 91 S.Ct. at 1059 (emphasis added). Thus, both the language and the structure of the opinion show that the Court in *Rewis* considered itself faced with the question of whether to *broaden* the coverage of the Travel Act *beyond* the ordinary meaning of its language. In such a situation, where a statute can be liberally interpreted to reach conduct outside its plain language, it is entirely appropriate to look, as did the Supreme Court, to the legislative history to determine whether such an extension would further congressional purposes.

In contrast, when a statute on its face clearly covers certain activity, as in the instant case, we believe a court should accept the statute as written and avoid plunging into the murky waters of legislative history in an attempt to fathom whether Congress really intended to reach what the language of its statute *does* reach. *See* United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); United States v. Barnes, 383 F.2d 287, 289 n. 2 (6th Cir. 1967) cert. denied, 389 U.S. 1040, 88 S. Ct. 780, 19 L.Ed.2d 831 (1968); *cf.* Dameron v. Brodhead, 345 U.S. 322, 326, 73 S.Ct. 721, 97 L.Ed. 1041 (1953). For, as the Supreme Court has said, "[t]he plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction." Gemsco, Inc. v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 614, 89 L.Ed. 921 (1945). *See also* Ex Parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949). Put another way, to look to legislative history in this case would be to no end, since "[w]here the language of a statute is plain there is nothing to construe." Hengesbach v. Hengesbach, 73 U.S.App.D.C. 1, 114 F.2d 845, 846 (1940).

Furthermore, as Judge Friendly expressed at one point in his *Archer* opinion, 486 F.2d at 680, we do not believe it is normally a proper judicial function to try to cabin in the plain language of a statute, even a criminal statute, by limiting its coverage to the *primary* activity Congress had in mind when it acted.[9] *See* United States v. Roselli, 432 F.2d 879, 885 (9th Cir. 1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). As recently stated by Judge Boreman of this circuit, the proper approach is to "look to the unambiguous words of the criminal statute to determine its meaning and not to the purported intentions of a congressional committee." United States v. White, 475 F.2d 1228, 1234–1235 (4th Cir. 1973). To do otherwise could lead to great uncertainty concerning exactly what activity is proscribed by a given statute. It could also transform every criminal appeal into a scouring of the legislative history of the relevant stat-

---

9. Judge Friendly noted in Archer not only that the Travel Act on its face reaches many more activities than the legislative history showed Congress intended to reach, but that the body of the statute was strikingly broader in scope than its title would suggest:

> The title refers only to interstate and foreign travel or transportation; yet the text also includes the use of any facility in interstate or foreign commerce. The title refers only to acts "in aid of racketeering enterprises"; yet the definition of "unlaw-

ful activity" in the text displays no such limitation.

486 F.2d at 678. But just as he acknowledged that courts could not rightly limit an act to Congress's primary purpose in passing it, he also recognized, as do we here, that "[i]t would go beyond the proper exercise of judicial power for courts to confine the Travel Act to its title." *Id.* at 680, *citing* Fraser v. United States, 145 F.2d 139, 142 (6th Cir. 1944), cert. denied, 324 U.S. 849, 65 S.Ct. 684, 89 L.Ed. 1409 (1945).

utes to determine whether the legislature addressed itself to the precise activity engaged in by the particular defendant. There is already enough to litigate about without that. *Cf.* United States v. Miller, 379 F.2d 483, 488 (7th Cir.), cert. denied, 389 U.S. 930, 88 S.Ct. 291, 19 L.Ed.2d 281 (1967) ; 1 National Commission on Reform of Federal Criminal Laws, Working Papers 37–38 (1970).

■ Nor does the so-called "rule of lenity," Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955), cited by Mr. Justice Marshall in *Rewis,* 401 U.S. at 812, 91 S.Ct. 1056, and invoked by appellants here, have any place in our analysis. That "rule," which requires that criminal statutes be interpreted in favor of leniency to the accused, "only serves as an aid for resolving an ambiguity; it is not to be used to beget one." Callanan v. United States, 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961). There is no ambiguity in the statute as applied to the facts of this case.

How far Congress should extend federal criminal jurisdiction is a matter of interest and concern to the judicial branch. But resolution of the question is not for us. There is an appropriate role, however, for the executive branch. We agree with Judge Friendly, who said in *Archer,* 486 F.2d at 678, that the responsibility for keeping federal criminal prosecutions within appropriate bounds for a federal system rests, in the first instance, with United States attorneys

under the active guidance of the Attorney General. *See* Friendly, Federal Jurisdiction: A General View 55–61 (1973).

It should be emphasized that the exercise of prosecutorial discretion is common. The Mann Act fits the adulterer who chooses another state as the place of assignation, but such cases rarely if ever appear in a federal court. When an Asheville, North Carolina, thief steals a car, he has two or more choices of how to drive it to Charlotte—no one of which is better than another. But one way will take him through the edge of South Carolina, and that "happenstance" will undoubtedly invoke the Dyer Act. These two kinds of cases— prostitution and car theft—are triggered identically as is the application of the Travel Act. "The sole reason for conditioning the statutes' prohibitions upon use of interstate commerce is to provide a constitutional basis for the exercise of federal power." United States v. Roselli, *supra,* 432 F.2d at 891.[10]

■■ We think the solution to the problem of expanding federal criminal jurisdiction is not for the courts to deny that the jurisdiction exists and that Congress may implement it but instead for the executive branch to exercise wisely the discretion vested in it by the Congress.[11] We hold, therefore, that when the ordinary meaning of the Travel Act clearly covers an activity, we will not read into the Act any requirement that travel in interstate commerce or use of facilities in interstate commerce be a "substantial" or an "integral" part of

---

10. In the course of analyzing 18 U.S.C. § 1343 (1970) the Second Circuit has said:

> The use of interstate communication is logically no part of the crime itself. It is included in the statute merely as a ground for federal jurisdiction.

United States v. Blassingame, 427 F.2d 329, 330 (2d Cir. 1970), cert. denied, 402 U.S. 945 (1971). This court in *Salsbury, supra,* 430 F.2d at 1048 stated that "the legislative history of § 1952 indicates that interstate facilities, including the mails, are jurisdictional means through which federal officers can assist local law enforcement." We ad-

here to that view. *See* H.R.Rep.No.966, 87th Cong., 1st Sess., reprinted in 2 U.S. Code Cong. & Admin.News, p. 2664 (1961).

11. The Final Report of the National Commission on Reform of Federal Criminal Laws contains a section 207 entitled "Discretionary Restraint in Exercise of Concurrent Jurisdiction." This is a carefully-worded provision affording federal law enforcement agencies clear guidelines as to whether or not it is appropriate and desirable in a federal system to initiate prosecution in a given case or to leave the matter to the operation of the criminal laws of the states.

the activity. Instead, we will apply the Act as it is written.[12]

## II.

■ As an alternative to their argument that the interstate aspects of Le-Faivre's operation were insufficient as a matter of law to bring the Travel Act into play, appellants contend that the issue of sufficiency of use of interstate facilities should have gone to the jury as a factual question. What we have said previously also disposes of this assignment of error. We hold the district judge correctly charged the jury as follows:

Section 1952 does not require that the use of facilities in interstate commerce have been essential to the gambling business allegedly operated by the Defendants; that use need only facilitate the promotion, management, establishment, or carrying on of the illegal gambling business.

Tr. at 961, quoted in Appendix for Appellants at 117.[13]

## III.

■ The trial judge charged the jury, with respect to both the conspiracy charge and the substantive Travel Act charges, that a guilty verdict required neither a finding that the defendants intended to use facilities in interstate commerce, nor a finding that they knew they were using such facilities.

We think the plain language of § 1952 disposes of the contention of the Le-Faivres, who actually cashed the checks involved here, that the statute requires a *knowing* use of facilities in interstate commerce. Nothing is said about knowledge. The language embraces "[w]hoever . . . uses any facility in interstate or foreign commerce." There is sufficient *mens rea* if there is "intent to . . . promote, manage, establish, carry on, or facilitate the promotion [etc.] of any unlawful activity." The statute speaks only to the *purpose* for which one uses interstate facilities, not the *knowledge* with which one does so. *See* United States v. Roselli, *supra,* 432 F.2d at 890–891; United States v. Bash, 258 F.Supp. 807, 809–812 (N.D. Ind.1966), aff'd sub nom. United States v. Miller, *supra,* 379 F.2d 483.[14]

12. When the words of the statute, given their normal meaning, do *not* clearly cover an activity—as was the case in *Rewis*—our approach will necessarily be different. As did the Supreme Court in *Rewis*, we will then have to determine whether application of the Act to the particular defendant would further Congress's purpose in passing the statute, or would instead tend to pervert congressional intent. In such cases we will be governed by the maxim reiterated by the Supreme Court in *Rewis* itself, that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." 401 U.S. at 812, 91 S.Ct. at 1059, *citing* Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

13. To the extent that United States v. Presley, 478 F.2d 163 (5th Cir. 1973), on which appellants rely, suggests that the substantiality and essentiality issues should go to the jury, we simply believe that decision is wrong.

14. Congress's omission of any knowledge requirement with respect to the use of facilities in interstate commerce makes good sense. The use of facilities in interstate commerce is, as we noted above in this opinion, nothing more than the jurisdictional peg on which Congress based federal jurisdiction over the unlawful activities enumerated in the Travel Act. The use of interstate facilities adds nothing whatsoever to the "criminality" of the person who is already engaged in one of the named unlawful activities. Thus, there is no need to require any mental element with respect to use of interstate facilities, since any mental element that Congress did write in would still not be any part of the *mens rea* of the criminal activity itself. *Cf.* Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957); Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Similar considerations have led Congress to omit any mental element with respect to the jurisdictional component of several other statutes, and have led courts to uphold those statutes as written. *E. g.,* 18 U.S.C. § 201(b)(1) (1970) (bribery of a federal official); 18 U.S.C. § 111 (1970) (assault of a

■ Appellants Miller and Eckert, who acted only as "telephone girls" in receiving bets, urge upon us that since they handled no checks and thus did not "use" a facility in interstate commerce, their substantive convictions cannot be sustained. They would be right but for 18 U.S.C. § 2 (1970), which makes aiders and abettors principals.

■ In upholding Miller's and Eckert's convictions we necessarily refuse to adopt the reasoning of the Sixth Circuit in United States v. Barnes, 383 F.2d 287, 289–293 (6th Cir. 1967), cert. denied, 389 U.S. 1040, 88 S.Ct. 780, 19 L. Ed.2d 831 (1968), which Miller and Eckert rely upon here. The Sixth Circuit stated that in order to convict one who did not actually use a facility in interstate commerce, it would be necessary to prove that the person "reasonably could be expected to know of the commission of the forbidden acts" by some other participant in the scheme. 383 F.2d at 292; cf. United States v. Salsbury, supra, 430 F.2d at 1049–1050. The court in Barnes in effect adopted a "sliding scale" with respect to the knowledge requirement, in which the degree of knowledge of the interstate element required to convict a defendant would increase the further the defendant was from the actual use of the facilities in interstate commerce. See also Twitchell v. United States, 313 F.2d 425, 429 (9th Cir. 1963), vacated and remanded sub nom. Rogers v. United States, 376 U.S. 188, 84 S.Ct. 637, 11 L.Ed.2d 603 (1964). Appellants Miller and Eckert have paraphrased that argument to say that since they were "peripheral figures" in the gambling scheme insofar as the handling of money was concerned, the jury should have been required to find either actual knowledge or some degree of probability of knowledge on their part of the use of interstate facilities.

We disagree. Since Congress did not require knowing use of interstate facilities on the part of the person who directly violates the Travel Act, we see no justification for requiring that one who aids him in the underlying unlawful activity have more knowledge than he does. Holding Miller and Eckert liable as aiders and abettors despite their lack of knowledge of LeFaivre's use of interstate facilities is not the same thing, contrary to the Sixth Circuit's fears, see Barnes, 383 F.2d at 292, as holding them liable for any independent crime committed by LeFaivre in furtherance of the gambling operation and without their knowledge. The reason is simple. The use of interstate facilities is not a crime requiring an additional mens rea beyond that required for participation in the gambling activity itself; it is just an act that confers federal jurisdiction over the underlying gambling activity, and nothing more. In this respect it differs from robbery of a bank—which LeFaivre might also have done in furtherance of his gambling operation, if he had fallen into debt—because robbery of a bank requires an independent mens rea beyond that involved in the gambling operation itself. Assuming they were unaware of it, Miller and Eckert could not be prosecuted as aiders and abettors of the bank robbery because of this distinction, since an aider and abettor must have the same mens rea as the principal actor. See Snyder v. United States, 448 F.2d 716, 718 (8th Cir. 1971).

■ Alternatively, we sustain the Travel Act convictions of Miller and Eckert on the rationale of Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), also charged by the trial judge below, Tr. at 963–64, quoted in Appendix for Appellants at 119–20; see Nye & Nissen v. United States, 336 U.S. 613, 618, 69 S.Ct. 766,

federal official in performance of his federal duty) ; 18 U.S.C. § 2313 (1970) (receipt of stolen vehicles moving in interstate commerce). See United States v. Alsondo, 486 F.2d 1339, 1342 (2d Cir. 1973) ; United States v. Jennings, 471 F.2d 1310, 1312 (2d

Cir. 1973) ; United States v. Bolin, 423 F.2d 834, 836–837 (9th Cir. 1970) ; National Commission on Reform of Federal Criminal Laws, Proposed New Federal Criminal Code § 204, Comment (Final Report, 1971).

93 L.Ed. 919 (1949), that they were willing members of the conspiracy in furtherance of which the acts constituting substantive Travel Act violations were committed.

■ As a separate point, appellants argue that even if no knowledge of use of facilities in interstate commerce is required for a substantive violation of the Travel Act, such knowledge and even a specific intent to use interstate facilities is necessary for a *conspiracy* to violate the Travel Act. Appellants' argument is based on the premise that conspiracy is a specific intent crime: in order to "conspire," persons must plan to do something specific. While appellants' premise is indeed black-letter law in most situations,[15] there is presently sharp disagreement over whether or not such conspiratorial knowledge and intent is required with respect to the jurisdictional element of a federal crime. The Sixth Circuit has held that such knowledge and intent is required with respect to the jurisdictional element of the Travel Act, United States v. Barnes, supra, 383 F.2d at 289–293, and the Second Circuit has recently reaffirmed its view that such knowledge and intent is required with respect to the jurisdictional element of all conspiracies to commit federal crimes, United States v. Alsondo, 486 F.2d 1339, 1342–1344 (2d Cir. 1973), cert. granted sub nom. United States v. Feola, 416 U.S. 935, 94 S. Ct. 1932, 40 L.Ed.2d 285 (1974). *See also* Nassif v. United States, 370 F.2d 147, 152 (8th Cir. 1966). But the Ninth Circuit has decided against any such requirement, United States v. Roselli, *supra*, 432 F.2d at 891–892, and the drafters of both the Model Penal Code and the Proposed New Federal Criminal Code have proposed its abolition in all

cases. *See* ALI, Model Penal Code § 5.- 03, Comment, at 112 (Tent. Draft No. 10, 1960); National Commission on Reform of Federal Criminal Laws, Proposed New Federal Criminal Code § 203(1), Comment, and § 1004(1), Comment 2 (Final Report, 1971). We agree with the Ninth Circuit and with the drafters of the model codes. The jurisdictional element should be viewed for purposes of the conspiracy count exactly as we view it for purposes of the substantive offense—simply as a jurisdictional peg on which to hang the federal prosecution. Whether or not certain conspirators actually anticipate the use of facilities in interstate commerce when they plan their unlawful activity of gambling, bribery, etc., adds absolutely nothing to the dangerousness of their scheme to the public weal. And it is the danger posed by a conspiracy that justifies prosecution of the inchoate "crime" of conspiracy even before any substantive offense has been committed. *See* United States v. Roselli, *supra*, 432 F.2d at 891–892 & n. 18. We think the trial judge's charge on the conspiracy count is correct.

### IV.

By way of summary, we hold:

1. In an ordinary case falling within the clear ambit of the Travel Act, it is sufficient to invoke federal jurisdiction that there be some utilization of a facility in interstate commerce and it is not requisite that such use be substantial or integral to the operation of the illegal enterprise.

2. In a prosecution under the Travel Act, whether for a substantive violation or for conspiracy, the government is not burdened with the necessity of proving that accused persons intended to use fa-

---

15. The concept of conspiracy as a specific intent crime, regardless of the nature of the underlying substantive offense, was best expressed by Judge Learned Hand in United States v. Crimmins, 123 F.2d 271, 273 (2d Cir. 1941):

While one may, for instance, be guilty of running past a traffic light of whose exis-

tence one is ignorant, one cannot be guilty of conspiring to run past such a light, for one cannot agree to run past a light unless one supposes that there is a light to run past.

cilities in interstate commerce or even knew of such use, but must show only that a facility in interstate commerce was actually used.

The convictions on all counts will be Affirmed.