**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Charles ZEMATER, Defendant-**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Raymond AULER, Defendant-**
**Appellant.**

**Nos. 73–1910, 73–1911.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1974.

Decided July 25, 1974.

Barry J. Freeman, Edward J. Calihan, Jr., Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Michael D. Groark, Asst. U. S. Atty., Chicago Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, KILEY, Senior Circuit Judge, and STEVENS, Circuit Judge.

PER CURIAM.

A six count indictment charged five men, including the two appellants, with criminal activity in connection with the alleged operation of prostitution in Saigon in December, 1970. Count I charged a conspiracy[1] to violate the Mann Act[2] and the Travel Act.[3] Counts II, III, IV, and V charged substantive Mann Act violations, each in connection with one of the four women involved. Count VI charged a substantive offense under the Travel Act, namely the use of interstate facilities to effectuate a violation of the Illinois Pandering Statute.[4] The appellants were found guilty by a jury on all six counts.[5]

This appeal challenges the sufficiency of the evidence on Counts IV and V, the correctness of numerous rulings made by the trial judge, and whether the Government's evidence proves a violation of the Travel Act.

The undisputed facts can be briefly summarized. Both appellants were theatrical agents, Auler working in Milwaukee and Zemater in Chicago. In September, 1970, Auler traveled to Saigon to arrange bookings for three groups of entertainers. In Vietnam he was in contact with one James Cotton, who was planning to open a nightclub named "The Office" in Saigon for the benefit of American servicemen. Upon his return to the United States, Auler asked Zemater to help locate four girls to work in the Saigon club.

---

1. Title 18 U.S.C. § 371 provides, in pertinent part:

    "If two or more persons conspire . . . to commit any offense against the United States, . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. Title 18 U.S.C. § 2421 provides, in pertinent part:

    "Whoever knowingly transports in interstate or foreign commerce, . . . any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; . . . [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both."

3. Title 18 U.S.C. § 1952 provides, in pertinent part:

    "(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to— . . .

    "(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

    "and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both."

4. The statute, Ill.Rev.Stat. Ch. 38, § 11–16, is set forth in note 13, infra.

5. One of the men named in the indictment was severed as a fugitive; a second pleaded guilty to Count I prior to trial, and the indictment was dismissed as to him on the remaining counts; and, the district court granted the third's motion for judgment of acquittal at the close of the Government's evidence.

In November, 1970, the appellants traveled to Madison, Wisconsin, where they approached Renee Kocoa and Margaret Paull, the women named in Counts IV˙ and V of the indictment, about going to Saigon. In Madison, they were performing as dancers in a nightclub; they testified that they were given the impression that in Saigon they would be doing the same.

At about the same time, arrangements were made in Chicago with two other women, Sandra Lucido and Bobby Jean Wheeler, to go to Saigon to work in the same nightclub.

On approximately November 28, 1970, the four women and Auler left· Chicago and traveled to Saigon via San Francisco and Hong Kong. The women performed as dancers in Cotton's nightclub in Saigon. There was also evidence that each of the women engaged in prostitution. After approximately 10 days, the four women left the villa in which "The Office" was located and, with the help of the American Embassy, returned to the United States.

There are three different versions of the facts which must be identified. They may be described chronologically as (1)˙ the government's original theory; (2) the alternate theory; and (3) the post-trial theory.

The original theory of the prosecution, which was supported by the pretrial statements of all four women, their testimony before the grand jury, and the direct testimony of Kocoa and Paull, was that all four of them were hired to go to Saigon as dancers, that after their arrival they were forced to engage in prostitution, and that they made a dramatic escape from "The Office" to the American Embassy 10 days after their arrival. Although this was the prosecutor's theory when the case was presented to the grand jury, when the opening statements were made, and during the first portion of the trial, it is no longer seriously maintained.

After the trial was under way, and prior to the cross-examination of Paull —the second "victim" to testify in support of the original forced prostitution theory—the government advised the court that their next witness, Wheeler, had drastically changed her story and had completely recanted her earlier statements and grand jury testimony about forced prostitution and the "escape." Thereafter the government's evidence tended to support its alternate theory, namely, that the four women were employed by appellants to work voluntarily as prostitutes in Saigon. In the subsequent portions of the trial, the "victims" Wheeler and Lucido, as well as the witnesses VanNess and Monaghan (both of whom testified that they had formerly done business with appellants), gave testimony supporting this theory. Assuming that such testimony is credible, it would be sufficient to support a fairly typical Mann Act violation involving Wheeler and Lucido, and would also provide a basis for inferring that identical arrangements were made with Kocoa and Paull, since there was evidence that all four women did engage in prostitution in Saigon.

The third version of the entire matter is supported by two rather detailed affidavits attached to appellants' "Motion to Remand for Hearing on Defendants' Motion for a New Trial," which was filed in this court after the case had been taken under advisement. These affidavits, if true, indicate that the original version was correct insofar as it indicated a complete absence of discussion between the appellants and the four women about working as prostitutes in Saigon, and that the alternate version is correct insofar as it indicates that there was no forced prostitution in Saigon and no dramatic "escape" from involuntary custody. Under the post-trial version of the events, appellant merely hired the four women to work as dancers and they voluntarily undertook to enhance their earnings by (a) working as prostitutes in Saigon largely on their own initiative, and (b) contrived the highly publicized escape to the American Embassy to provide material for a lurid book which

they contracted to publish upon their return to the States. The affidavits set forth evidence which, if true, and if available at the trial, might have been sufficient to cause the jury to accept the third version as the correct one.

The blatant contradictions in the evidence adduced at trial, and also between certain portions of the record and the post-trial affidavits, make it perfectly clear that significant false testimony was given. Normally a motion such as the post-argument motion to remand which has been filed by appellants should be addressed to the trial court in the first instance. The extraordinary circumstances portrayed by this record, however, fortified by the paramount importance of avoiding the risk of injustice to the litigants, persuades us that the matter should be more fully explored by the district court before we finally dispose of this appeal.

## I.

Without passing on the points argued on the appeal from the convictions on Counts I, II, III, IV, and V, we have decided to vacate the judgment of the district court and to remand the case for such hearings or other proceedings as that court may deem appropriate. Because of Judge McLaren's firsthand knowledge of the proceedings, Circuit Rule 23 shall not apply. Moreover, if the District Judge concludes that a delay in the hearing is appropriate in order to give any party time to develop relevant evidence, he shall have full discretion to grant such continuances as he deems justified. He shall also have the same authority he had prior to the filing of the notice of appeal to set aside the con-

victions or to order a new trial. On the other hand, if, after considering the affidavits attached to appellants' motion, which have not previously been presented to him, as well as such further evidence as he deems relevant, he should then conclude that such evidence, even when considered in connection with the government's dramatic change of theory during the course of the trial, does not warrant setting aside the convictions, he shall have power to enter a fresh judgment or judgments from which a new appeal may be taken without prejudice to the points heretofore raised by appellants. Compare the procedure described by Judge Hastings in United States v. O'Brien, 444 F.2d 1082 (7th Cir. 1971), see especially 1086–1087. See also United States v. Cleveland, 477 F.2d 310, 316 (7th Cir. 1973).

## II.

In all events, however, appellants' convictions under the Travel Act, 18 U.S.C. § 1952, cannot stand. The difficulty is not, as in United States v. Altobella, 442 F.2d 310 (7th Cir. 1971) and United States v. McCormick, 442 F.2d 316 (7th Cir. 1971),[6] that the use of interstate facilities was only incidental to the violation of state law. Neither is it that the general scheme in which the jury believed the appellants to have been involved was outside the ambit of Congressional concern when the Travel Act was enacted.[7] The problem is that the charge in the indictment did not comply with the statutory requirement concerning the sequence of interstate travel and the violation of state law, and, therefore, charged no offense.[8]

■■ The prescriptive language of the statute is set out above.[9] In sub-

---

6. See also United States v. Archer, 486 F.2d 670, 685 (2d Cir. 1973) (Friendly, J.)

7. See Rewis v. United States, 401 U.S. 808, 811–812, 91 S.Ct. 1056, 28 L.Ed.2d 493. See also, n. 11, *infra*.

8. The indictment charged that the defendants did "knowingly and willfully travel . . . from Chicago . . . to Saigon, Republic of Vietnam, with the intent to promote, manage, establish and carry on and facilitate the promotion, management, establishment

and carrying on of an unlawful activity, that is, a business enterprise involving pandering, in violation of the laws of the State of Illinois, Chapter 38, Illinois Revised Statutes, Section 11–16, and thereafter did perform and attempt to perform· acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of said unlawful activity; all in violation of Title 18, United States Code, Sections 2 and 1952."

9. See n. 3, *supra*.

stance it requires that, for a person to be guilty of its violation, he must have "used a facility in interstate commerce to facilitate the carrying on" of an illegal enterprise as defined by the statute "and *thereafter* performed the carrying on" of the unlawful activity.[10] An unlawful activity is defined by subsection (b) of the statute as follows:

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States."

Its plain language appears to require that the activity following the travel violates the law of the jurisdiction in which it occurs.[11] The question we must decide is whether the travel to Saigon, and the prostitution which then occurred, constitutes a violation of the Illinois Pandering Act so as to come within the language of § 1952, as the indictment specifically charged.[12]

The Illinois Pandering Act is set out in the margin.[13] It is clear from its express terms that a violation of subsection (a)(2), if it occurred, was complete before the travel to Saigon began. Arguably, however, a violation of subsection (a)(1) was incomplete. When that language is read with the provisions of the Illinois Criminal Code asserting the State's extra-territorial criminal jurisdiction,[14] the activity in Saigon can be treated as completing a violation of the Illinois Pandering Act.

But even if the activity in Saigon violated the Illinois statute, it did not violate the Travel Act. Subsection (b) of the federal statute requires the acts committed after the travel to be in violation of the laws of the state "in which they are committed." Since Congress *could* have punished travel merely

---

10. The language quoted in the text, which accurately paraphrases the portion of the statute following the word "thereafter," see n. 3, *supra*, is taken from the Fourth Circuit's opinion in United States v. Wechsler, 392 F.2d 344, 347 (1968). If Judge Craven had not italicized the word "thereafter" in his opinion, we would have done so. *Cf.* United States v. Altobella, *supra*, 442 F.2d at 314.

11. Had the Government charged a violation of the Travel Act with reference either to Auler's September trip from Milwaukee to Saigon, or Zemater's trip from Chicago to Madison, and thereafter the violation of the Illinois Pandering Act, the problem presently under consideration would not arise. Since it would have been a fatal variance from the indictment had the Government sought to prove a violation of § 1952 at trial by reference to this earlier travel, it follows that we cannot uphold the convictions because of it.

12. We need not decide whether violation of the criminal laws of the Republic of Vietnam comes within the prohibition of the Act, for the Government's theory depended solely upon violation of Illinois law.

13. The Act, Ill.Rev.Stat., Ch. 38, § 11–16, provides as follows:

"(a) Any person who performs any of the following acts for money commits pandering:
(1) Compels a female to become a prostitute; or
(2) Arranges or offers to arrange a situation in which a female may practice prostitution.
"(b) Penalty.
A person convicted of pandering by compulsion shall be imprisoned in the penitentiary from one to 10 years. A person convicted of pandering other than by compulsion shall be imprisoned in a penal institution other than the penitentiary not to exceed one year or in the penitentiary from one to 5 years."

14. Ill.Rev.Stat., Ch. 38, § 1–5 provides in pertinent part:

"(a) A person is subject to prosecution in this State for an offense which he commits, while either within or outside the State, by his own conduct or that of another for which he is legally accountable, if:
(1) The offense is committed either wholly or partly within the State . . . .
"(b) An offense is committed partly within this State, if either the conduct which is an element of the offense, or the result which is such an element, occurs within the State. . . .

in furtherance of criminal activity, this language is plainly not superfluous. The "thereafter" clause constitutes an express limitation on the coverage of the statute.[15] By § 1952, Congress authorized the exercise of federal power to aid the states in the enforcement of their criminal laws when offenders travel into such states in order to carry on certain kinds of criminal activity. Since Congress had ample power to authorize federal assistance to any state from which travel with criminal purposes commences, *cf.* United States v. Walker, 489 F.2d 1353 (7th Cir. 1973), its explicit decision not to do so may not be circumvented by reference to the long-arm criminal jurisdiction statutes of the several states.

The judgments of conviction on Counts I, II, III, IV, and V are vacated and the case is remanded to the district court for further proceedings consistent with the foregoing. The convictions on Count VI are reversed.

15. "That Congress did not intend to exercise its full constitutional powers in the area of local law enforcement is demonstrated by the wording of the Act and specifically by the use of the word 'thereafter.' As the Senate report on S.1653 states: ' * * * to come within the provisions of the bill some activity in furtherance of a racketeering enterprise, subsequent to the performance of the travel, must take place * * * accordingly the gravamen of the offense will be travel and a further overt act to aid the enterprise.' S.Rep.No.644, 87th Cong. 1st Sess. 1961, p. 2." United States v. Altobella *supra,* 442 F.2d at 314 (footnote omitted).