**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Callie Blaine EISNER, Defendant-Appellant.**

**No. 75–1908.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1975.

Decided April 14, 1976.

Rehearing and Rehearing En Banc Denied June 15, 1976.

Morris Weintraub, Newport, Ky., for defendant-appellant.

Eugene E. Siler, Jr., U. S. Atty., R. Burl McCoy, James E. Arehart, Asst. U. S. Attys., Lexington, Ky., for plaintiff-appellee.

Before EDWARDS and MILLER, Circuit Judges, and CHURCHILL, District Judge.*

* Honorable James P. Churchill, United States District Judge for the Eastern District of Michigan, sitting by designation.

CHURCHILL, District Judge.

The appellant was charged in a two-count indictment with violation of 18 U.S.C. § 1952, commonly known as the Travel Act. This Act makes it a federal crime to use a facility in interstate commerce to facilitate the carrying on of an unlawful activity and thereafter engage in the unlawful activity. The Act defines unlawful activity to include any business enterprise involving prostitution offenses as defined by state law. In both counts the alleged unlawful activity was prostitution, lewdness, and assignation in violation of Kentucky Revised Statutes § 436.075. In the first count the alleged interstate element of the offense was the use of the bank clearing system. In the second count the alleged interstate element was the transportation of a prostitute across state lines. After a bench trial the appellant was found guilty of the first count and not guilty of the second count.[1]

The testimony can be summarized as follows. The appellant between August 13, 1973, and February 22, 1974, the dates specified in the indictment, was the owner of a nightclub known as the Pink Pussycat located in Newport, Kentucky. Bernice Jones was the manager of the club.[2] The club employed dancers of the exotic variety. The testimony of one of the dancers, Tracy Tippit, and one of the customers, Jack Trainer, established that various dancers engaged in a variety of sexual acts with various customers for a price. Bernice Jones handled the day-to-day operation of the club. Tracy Tippit testified that on one occasion the appellant was present at the club when other dancers went into the back room with customers. Bernice Jones testified that she had been hired by the appellant, that the appellant kept the daily ledgers, and that the appellant often paid the dancers.

Jack Trainer paid for his entertainment with checks drawn on a Cincinnati bank. A total of fifteen (15) checks were introduced at the trial. Five of these checks were made out to Cash, three were made out to the Pink Pussycat, and the remainder were made out to Bernice Jones. Two of the checks, in amounts of $333.50 and $839.25 respectively, were signed in the name of the appellant as the endorser. The checks were negotiated at the State Bank of Dayton in Kentucky. Three of the checks were deposited into the account of the Pink Pussycat. The remainder were cashed. The checks were then delivered to the maker's bank in Ohio, where they were charged to his account, and the funds were then remitted back to the Kentucky bank.

Appellant assigns four claims of error.

## I. SUFFICIENCY OF EVIDENCE

The appellant asserts that certain findings of fact were not supported by the evidence. The appellant acknowledges that acts of prostitution did take place at the Pink Pussycat but asserts that there was insufficient evidence to support a finding that such acts took place with her knowledge and consent. In considering a contention that the evidence is insufficient to support a judgment of conviction, an appellate court will reverse the judgment only if it is not supported by substantial and competent evidence. *United States v. Kubeck*, 487 F.2d 1256 (C.A.6 1973). Where, as here, the evidence is wholly circumstantial, the same test applies; and it is not necessary that such evidence remove every reasonable hypothesis except that of guilty. *United States v. Morgan*, 469 F.2d 83 (C.A.6 1972). A review of the testimony summarized above indicates that there was substantial and competent evidence to support the court's finding that these activities took

1. The trial judge in his memorandum of decision and the government in its brief, to satisfy the Travel Act's requirement that there be the use of a facility in interstate commerce, rely in part on the fact that the defendant placed ads in certain Cincinnati newspapers. The indictment makes no mention of these acts, and this variance from the indictment cannot be the

basis of a conviction. *United States v. Zemater*, 501 F.2d 540, 544, fn. 11 (C.A.7 1974).

2. Bernice Jones was charged along with Callie Blaine Eisner in both counts of the indictment. She also was found guilty of the first count and not guilty of the second count. Jones has not appealed her conviction.

place with the knowledge and consent of the appellant.[3]

## II. EXTENT OF USE OF A FACILITY IN INTERSTATE COMMERCE

The appellant asserts that the mere deposit or cashing of an out-of-state customer's checks, knowing that the checks will travel from Kentucky to Ohio, is such a minimal and incidental use of an interstate facility that it cannot give rise to a violation of the Travel Act. The relevant statutory language reads as follows:

" § 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises.

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

"(1) distribute the proceeds of any unlawful activity; or

"(2) commit any crime of violence to further any unlawful activity; or

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both."

A number of cases have dealt with this issue.

In *United States v. Wechsler*, 392 F.2d 344 (C.A.4 1968), *cert. denied* 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968), the Fourth Circuit upheld a Travel Act conviction that was founded upon a local official depositing into his bank account an out-of-state check that had been received as a bribe. In *United States v. Salsbury*, 430 F.2d 1045 (C.A.4 1970), the Fourth Circuit upheld a Travel Act conviction that was founded upon the defendant cashing out-of-state checks in connection with a gambling operation. In both cases the court held that given the broad language of the statute, it was immaterial that the use of the interstate facilities was tangential to the illegal business.

Subsequently the Supreme Court in *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), held that conducting a gambling operation frequented by out-of-state bettors does not, without more, constitute a violation of the Travel Act. The court began by noting that the ordinary meaning of the language of the Travel Act did not seem to cover the acts complained of:

"Section 1952, prohibits interstate travel with the intent to 'promote, manage, establish, carry on, or facilitate' certain kinds of illegal activity; and the ordinary meaning of this language suggests that the traveler's purpose must involve more than the desire to patronize the illegal activity." 401 U.S. at 811, 91 S.Ct. at 1059, 28 L.Ed.2d at 496.

The court then explored the legislative history and determined that Congress did not intend the Travel Act to apply to criminal activity solely because it is at times patronized by out-of-state customers. The court concluded as follows:

"In short, neither statutory language or legislative history supports such a broad-ranging interpretation of § 1952. And even if this lack of support were less apparent, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity, *Bell v. United States*, 349 U.S. 81, 83 [75 S.Ct. 620, 99 L.Ed. 905]

---

3. The appellant's reliance on *United States v. Barnes*, 383 F.2d 287 (C.A.6 1967), *cert. denied* 389 U.S. 1040, 88 S.Ct. 780, 19 L.Ed.2d 831 (1968), is misplaced. There, the issue was not whether the defendants knew of the illegal enterprise but rather whether they knew that a facility in interstate commerce was used to facilitate the illegal enterprise. The government argued that it did not have to prove that all of the defendants knew of the use of the interstate facility. This Court rejected that argument and held that each defendant must have reason to know of the use of an interstate facility. This view was reaffirmed in *United States v. Prince*, 529 F.2d 1108 (C.A.6 1976). In this case the government proved that the appellant had reason to know of the use of an interstate facility.

(1955)." 401 U.S. at 812, 91 S.Ct. at 1059, 28 L.Ed.2d at 497.

Subsequent to the *Rewis* decision the Seventh Circuit decided a number of cases dealing with whether a minimal and incidental use of an interstate facility can give rise to a violation of the Travel Act. *United States v. Altobella*, 442 F.2d 310 (C.A.7 1971); *United States v. McCormick*, 442 F.2d 316 (C.A.7 1971); *United States v. Isaacs*, 493 F.2d 1124 (C.A.7 1974), *cert. denied* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). In *Altobella* the victim of an extortion scheme cashed an out-of-state check in order to pay the defendants. The defendants knew that this check would have to be cashed, and the check did, in fact, travel interstate. In *McCormick* the defendant placed an advertisement in a local newspaper seeking salesmen to peddle lottery tickets. A number of copies of the ad were mailed to the newspaper's out-of-state subscribers. *Isaacs* involved a bribery scheme in which the government's proof supporting federal jurisdiction rested on evidence that three of the checks used to distribute a portion of the proceeds had traveled interstate after being deposited by the defendants. In each of these cases the Seventh Circuit reversed the Travel Act conviction, holding that there must be something more than a minimal and incidental use of a facility of interstate commerce to satisfy the jurisdictional element of a Travel Act offense. The Seventh Circuit based this interpretation of the Travel Act in part on certain language in *Rewis* and in part on a reluctance to impinge on sensitive federal-state relationships by interpreting the Act broadly.[4]

The Second Circuit dealt with this problem in *United States v. Archer*, 486 F.2d 670 (C.A.2 1973), *reh. denied, id.,* at 683 (per curiam). This case involved a bribery scheme in which the basis of jurisdiction was one phone call made by a government agent from Paris and received by one of the defendants in New York. The court reversed the convictions, and there is language in the court's opinion which indicates that it is adopting the Seventh Circuit's interpretation of the Travel Act. But in responding to the government's petition for a rehearing, the court explained its decision in very narrow terms:

"While the Government professes alarm at the precedential effect of our decision, we in fact went no further than to hold that when the federal element in a prosecution under the Travel Act is furnished solely by undercover agents, a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves and that this was not met here. We adhere to that holding and leave the task of further line-drawing to the future." 486 F.2d at 685–686.

Subsequent to all these decisions the Fourth Circuit was again faced with this issue in *United States v. LeFaivre*, 507 F.2d 1288 (C.A.4 1974), *cert. denied* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). In *LeFaivre* the defendants were charged with participating in a gambling operation in which the basis of jurisdiction was the fact that fourteen (14) out-of-state checks offered in settlement of bets passed through interstate banking channels in the clearing process after having been cashed or deposited by one of the defendants. The Fourth Circuit declined to adopt the Seventh Circuit's interpretation of the Travel Act and reaffirmed the holdings of *Wechsler* and *Salsbury* that any use of an interstate facility in furtherance of one of the unlawful activities defined in the Act is enough to satisfy the jurisdictional requirements of the Travel Act.[5]

---

**4.** *Altobella* was filed three days after *Rewis.* The court in *Altobella* did refer to the *Rewis* decision in footnote 12, but did not rely on it. Rather, the court relied on the concept of federalism. The court in *McCormick* and *Isaacs* did rely in part on *Rewis.*

**5.** The Fourth and Seventh Circuits have at various times attempted to reconcile their respec-

tive views on this issue. At this point any such attempt on our part would be fruitless. In *Isaacs* the Seventh Circuit acknowledged that its view was in conflict with the ruling made in *Wechsler.* 493 F.2d at 1149. In *LeFaivre* the Fourth Circuit acknowledged that unless the Seventh Circuit decisions were limited to their precise factual settings, and there is little evi-

We also decline to adopt the approach taken by the Seventh Circuit and, rather, apply the rule stated by the Fourth Circuit in *LeFaivre*.

The court in *LeFaivre* pointed out that the Supreme Court in *Rewis* was speaking in the context of a fact situation that would have required extending the coverage of the Act beyond its literal language.[6] It was in this context that the Supreme Court discussed legislative history, federalism, and the need for lenity in interpreting a criminal statute.[7] Here, as in *LeFaivre*, the facts of the case bring it within the plain meaning of the Travel Act, and thus *Rewis* is inapposite. Facilities in interstate commerce were used every time an out-of-state check was cashed or deposited and then subsequently traveled interstate. As the court in *LeFaivre* noted:

> " . . . when a statute on its face clearly covers certain activity, as in the instant case, we believe a court should accept the statute as written and avoid plunging into the murky waters of legislative history in an attempt to fathom whether Congress really intended to reach what the language of its statute *does* reach." (Emphasis in original.) 507 F.2d at 1295.

The court in *LeFaivre* also dealt with the argument that federal criminal statutes should be narrowly construed to avoid impinging on sensitive federal-state relationships. The court noted that:

> "How far Congress should extend federal criminal jurisdiction is a matter of interest and concern to the judicial branch. But resolution of the question is not for us. There is an appropriate role,

however, for the executive branch. We agree with Judge Friendly, who said in *Archer*, 486 F.2d at 678, that the responsibility for keeping federal criminal prosecutions within appropriate bounds for a federal system rests, in the first instance with United States attorneys under the active guidance of the Attorney General. *See* Friendly, Federal Jurisdiction: A General View 55–61 (1973).

> "It should be emphasized that the exercise of prosecutorial discretion is common. The Mann Act fits the adulterer who chooses another state as the place of assignation, but such cases rarely if ever appear in a federal court. When an Asheville, North Carolina, thief steals a car, he has two or more choices of how to drive it to Charlotte—no one of which is better than another. But one way will take him through the edge of South Carolina, and that 'happenstance' will undoubtedly invoke the Dyer Act. These two kinds of cases—prostitution and car theft—are triggered identically as is the application of the Travel Act." 507 F.2d at 1296.

■ There was sufficient evidence to support the trial court's finding that the appellant used a facility in interstate commerce to facilitate the carrying on of an illegal business.

## III. TIMING OF USE OF A FACILITY IN INTERSTATE COMMERCE

■ The appellant asserts that there was no evidence that she performed any illegal acts after the checks traveled interstate. The Travel Act does require that illegal acts be performed after the use of a

---

dence in the language of these decisions that they are so limited, then its view was in conflict with these decisions. 507 F.2d at 1294.

**6.** Additional support for this view is found in the case of *United States v. Villano*, 529 F.2d 1046 (C.A.10 1976). There, the defendants were convicted of participating in a Colorado gambling operation. The use of interstate facilities was limited to agents of the defendants taking bets in Nebraska and making interstate phone calls to Colorado. The court upheld the

convictions. The court noted that *Rewis* did not compel a contrary result, since there the Supreme Court focussed on the fact that the interstate activity was limited to the acts of the patrons.

**7.** The Seventh Circuit in *Altobella* acknowledged that the Travel Act can be read to cover a case where the use of a facility in interstate commerce is minimal and incidental. 442 F.2d at 311.

facility in interstate or foreign commerce. Appellant relies on *United States v. Zemater*, 501 F.2d 540 (C.A.7 1974). There, the use of a facility in foreign commerce consisted of certain of the defendants traveling to Saigon and causing others to travel to Saigon. The illegal activity that was charged in the indictment took place at a point in time prior to this trip. The court reversed the convictions in part because the illegal activity took place prior to the use of a facility in foreign commerce. In *Zemater* there was only one use of a facility in foreign commerce. In the instant case there was a series of fifteen (15) checks, and the traveling interstate of each of these checks constituted the use of a facility in interstate commerce. Each of the checks constituted payment for illegal activities, and thus fourteen (14) of the checks were followed by additional illegal activity. The court in *LeFaivre* was met with a similar situation. A series of out-of-state checks was involved, and they were each payments on bets that had been made. There, as here, the appellants argued that the illegal activity preceded the use of a facility in interstate commerce. The court held that:

> "And since the gambling operation was ongoing over a period of years, there can be no doubt that LeFaivre and the others continued to perform their illegal activity *after* the use of interstate facilities, thus meeting the Act's requirement that a person engage in the substantive offense following the involvement of interstate commerce." (Emphasis in original.) 507 F.2d at 1291.

There was sufficient evidence that the defendant performed illegal acts after the use of a facility in interstate commerce.

### IV. PUBLIC TRIAL

██ Appellant asserts that the exclusion of spectators from the courtroom during the testimony of one of the government's witnesses was a violation of her right to a public trial. Prior to the testimony of Tracy Tippit, a former dancer at the Pink Pussycat and one of two principal witnesses for the prosecution, the trial judge made the following statement:

> "I am going to eliminate from the courtroom spectators, other than accredited members of the press. There is reason to believe that this next witness has a fear of the courtroom and the persons that might be in it, and this Court is unable to say that this fear is unreal or imaginative, and accordingly, I propose to proceed in that fashion."

This is the only thing in the record which indicates why the judge ruled as he did. The appellant made a timely objection to this ruling. The objection was overruled. The testimony of this witness was then taken in the absence of spectators. Members of the press were allowed to remain in the courtroom. At the close of her testimony the spectators were permitted to reenter the courtroom. When Ms. Tippit was recalled by the government as a rebuttal witness, the judge announced that spectators would not be excluded.

The purpose of the Sixth Amendment public trial requirement is to guarantee that a defendant will be fairly dealt with and not unjustly condemned. *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *In Re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948). The right to a public trial is not absolute but rather must be balanced against other interests which might justify the closing of the courtroom to the public. *United States ex rel. Lloyd v. Vincent*, 520 F.2d 1272, 1274 (C.A.2 1975). The propriety of the trial court's action depends on the particular circumstances of the case. *Aaron v. Capps*, 507 F.2d 685 (C.A.5 1975). If it is determined that the trial court improperly excluded the public, prejudice is implied and an affirmative showing that the defendant was harmed is unnecessary to justify reversal. *United States ex rel. Bennett v. Rundle*, 419 F.2d 599 (C.A.3 1969); *Tanksley v. United States*, 145 F.2d 58, 10 Alaska 443 (C.A.9 1944); *Davis v. United States*, 247 F. 394 (C.A.8 1917).

Here, the trial court acted because of the witness' fear of testifying. A number of courts have held that this is a proper basis for excluding spectators from a trial. *Unit-*

*ed States ex rel. Bruno v. Herold,* 408 F.2d 125 (C.A.2 1969); *United States ex rel. Orlando v. Fay,* 350 F.2d 967 (C.A.2 1968), *cert. denied sub nom. Orlando v. Follette,* 384 U.S. 1008, 86 S.Ct. 1961, 16 L.Ed.2d 1021 (1965). *Geise v. United States,* 262 F.2d 151 (C.A.9 1958), *reh. denied* 265 F.2d 659 (C.A.9 1959); *United States ex rel. Smallwood v. LaValle,* 377 F.Supp. 1148 (E.D.N.Y.1974), and cases cited therein at fn. 4; see generally 48 A.L.R.2d 1436.

The appellant relies on *United States v. Kobli,* 172 F.2d 919 (C.A.3 1949). There, the trial court in a Mann Act case involving the transporting of a young woman to a house of prostitution excluded all of the spectators because of the fact that many young girls were in the courtroom. The Third Circuit held that this exclusion was improper because it was not limited in scope to those persons who the judge had reason to believe should have been excluded. Here, there is no problem with the scope of the judge's order, since he had apparently determined that the witness was afraid of any spectator being present in the courtroom.

The appellant also relies on *Tanksley v. United States, supra.* There, the trial court in a rape case in which the defense was consent excluded spectators for the entire trial to relieve the complaining witness of embarrassment. The Ninth Circuit held that this exclusion was improper. The court pointed out that the complaining witness would be embarrassed in any rape case where the defense was consent. The court then held that it would be a denial of the defendant's presumption of innocence to hold that a complaining witness must be relieved of this embarrassment. Here, unlike the situation in *Tanksley,* the judge did exclude the spectators for a proper reason— the witness' fear of people in the courtroom.

 The problem here, then, is not with the scope of the order or the reason for it, but rather with the sufficiency of the record made by the trial judge to support his finding that the witness was afraid of persons in the courtroom. The standard to be applied in determining whether there is

a sufficient record to support a trial judge's finding that grounds exist to exclude spectators from a courtroom is whether there has been an abuse of discretion. *United States ex rel. Lloyd v. Vincent, supra,* 520 F.2d at 1275. We cannot say that the trial judge abused his discretion in excluding spectators other than members of the press for a limited portion of the trial. We would, however, note, as did the court in *Vincent,* that the better course would have been for the trial judge to hold an evidentiary hearing prior to deciding that there was sufficient reason to exclude spectators.

The conviction is affirmed.