**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Thomas GRIFFIN, Defendant-Appellant.**

**No. 81–5957.**

United States Court of Appeals, Eleventh Circuit.

March 11, 1983.

---

Joel Hirschhorn, Miami, Fla., for defendant-appellant.

Deborah Watson, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before FAY and CLARK, Circuit Judges, and MARKEY *, Chief Judge.

MARKEY, Chief Judge:

In the United States District Court for the Southern District of Florida, Thomas Griffin was convicted by a jury of wire fraud (18 U.S.C. 1343 and 2) (Count II), of interstate travel with intent to promote an unlawful activity (18 U.S.C. 1952) (Count V), and of conspiracy to commit those offenses (18 U.S.C. 371) (Count I), all in relation to a scheme to profit from bets on races involving horses drugged by co-conspirators under Griffin's direction.[1] Griffin appeals, alleging failure of the evidence to support his convictions and ineffective assistance of counsel. We affirm.

### Background

In early 1975, Griffin operated a business called "Miami Thoroughbreds" from a Holiday Inn overlooking Calder Race Track in Miami. At that time he outlined to a groom, Robert Ostrander, a scheme to purchase horses, enter them in particular races at Calder, drug them and other horses, and then bet accordingly. Griffin enlisted five co-conspirators, obtaining a job for one with Mary Santos, a supplier of equestrian products, to insure access to the stable area at Calder. Griffin gave the drug he had concocted, and the names and stall numbers of horses to be drugged, to Ostrander and another, who then poured the drug into the water buckets of the selected horses. The record indicates that at least 13 horses were drugged, some repeatedly. Griffin and his group split the proceeds from bets made on the races, the outcome of which was thus controlled by Griffin.

Suspicions aroused, owners and trainers instituted extensive security measures in late 1975. Access to Calder's stables being foreclosed, Griffin sent Ostrander, two others of his cohorts, and later two horses, to Keystone Race Track in Pennsylvania, where Mary Santos' former employee obtained a vendor's license and obtained access to the stables. Cooperation of a willing trainer at Keystone was obtained. Daily surveys were conducted at Keystone and results were reported daily by Ostrander on the phone to Griffin in Miami. At week's end, Ostrander telephoned his opinion that security at Keystone appeared too tight. Griffin sent a lieutenant to investigate. After discussions with the earlier emissaries, with a local trainer willing to cooperate, and personal surveys of the "back of the track" or stable area, the four Calder cohorts and the willing trainer telephoned Griffin their conclusion that the scheme could not succeed at Keystone, and the scheme was abandoned there.

In December 1977, Ostrander told federal law enforcement officers about the scheme and his involvement.[2] By December 1978, investigation had progressed to the point of a decision to "wire" Ostrander. In a December 19, 1978 conversation with the still trusted but now electrified Ostrander, Griffin discussed numerous details of the

---

* Honorable Howard T. Markey, Chief Judge for the Federal Circuit, sitting by designation.

1. A motion for judgments of acquittal on bribery Counts III and IV was granted, and Count V was renumbered as III in a redacted indictment. Griffin's complaint that he should not have been charged on original Counts III and IV after they were dismissed in his co-conspira-

tor's trial is without merit in light of the government's unchallenged assertion that the witness expected to testify on those counts at Griffin's trial was hospitalized.

2. Griffin erroneously asserts that Ostrander began cooperating only after his arrest on counterfeiting charges in early 1978.

scheme and of his, Griffin's, participation in it.[3]

Ostrander was the principal witness for the prosecution at trial. His testimony was in many respects confirmed by Griffin's tape recorded admissions, by witnesses Mary Santos, Michael Potenza (a trainer), Frank Garey (investor who supplied money for Griffin's purchase of two horses), and racetrack officials, as well as by documentary evidence.

Griffin was sentenced to concurrent terms of 18 months' imprisonment on each of the convictions for wire fraud and conspiracy, and was placed on three years' probation on the conviction for interstate travel with intent to promote unlawful activity, the latter to begin on completion of his term of imprisonment.

### Issues

(1) Whether the evidence was sufficient to support Griffin's convictions.

(2) Whether ineffective assistance of trial counsel may be raised for the first time on direct appeal.

### OPINION

### (1) *Sufficiency of the Evidence*

Viewed in the light most favorable to the government, as viewed it must be, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), there was ample evidence here to support the jury's guilty findings on all three counts. Whatever the standard applied,[4] Griffin's challenge to the evidence is so lacking in merit as to require affirmance of the judgments on his convictions.

### (a) *Wire Fraud*

Griffin says Judge Davis erred in denying his motion for acquittal on Count II because the evidence failed as a matter of law to support the conviction on that count. Griffin does not deny that the phone calls were made, or that the actions related to those calls were taken. His sole argument is that the purpose of the calls was to terminate not to further any scheme involved.

Achieving a surface ingenuity by a narrowing concentration on the ultimate decision to abandon the scheme at Keystone, Griffin's argument founders on the facts. Ostrander called Griffin every day to report on the scheme-furthering activities undertaken at Keystone. Having reported for a week on the progress of the first steps required by the scheme, Ostrander expressed the view that security obstacles would frustrate a successful outcome of the scheme. Even then, Griffin sent a lieutenant to Keystone to review the situation. That most if not all the calls were devoted to reports on progress toward accomplishment of the scheme is a fact rendering the argument without merit.

Under the statute, the government was required to prove that Griffin engaged in an interstate telephone conversation for the purpose of executing a fraud-

---

3. Ostrander also recorded conversations with three other co-conspirators. Motions to suppress evidence of those conversations were denied at the trial of those co-conspirators, a trial occurring before Griffin's and attended by Griffin and his counsel.

4. Exhibiting concern that trial counsel's failure to renew his motion for acquittal at trial's end creates a need to show a "manifest miscarriage of justice," *United States v. Doe*, 664 F.2d 546 (5th Cir.1981); *United States v. Dawson*, 576 F.2d 656 (5th Cir.1978), Griffin suggests that the standard be whether the evidence is "such that a reasonably minded jury could find the evidence inconsistent with every reasonable hypothesis of defendant's innocence." *United*

States v. Rousseau*, 534 F.2d 584, 585 (5th Cir.1976). The government says that under the more lenient standard applicable if the motion had been renewed, we must affirm if "after viewing the evidence in the light most favorable to the government, and making all credibility choices and inferences in support of the verdict [we conclude that], a reasonable trier of fact could have found that the evidence established appellant's guilt beyond a reasonable doubt," citing *United States v. Davis*, 679 F.2d 845, 852 (11th Cir.1982), and *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (in banc). As reflected in the text, Griffin's attack on the evidence supplies no basis for reversal on the ground of insufficiency.

ulent scheme. 18 U.S.C. 1343.[5] Most, if not all, of the daily telephone conversations of Ostrander and Griffin had exactly that purpose and intent. Moreover, calls to discuss ways of executing a fraudulent scheme, as these calls were, were clearly made with the intent "that the communication [would] help further the scheme," and whether they actually furthered it is irrelevant. *United States v. Hammond,* 598 F.2d 1008, 1010 (5th Cir.1979).

Judge Davis correctly denied the motion for judgment of acquittal on Count II.

(b) *Interstate Travel*

Alleging failure of the evidence to support his conviction on Count V, Griffin employs essentially the same argument, asserting that his sole act subsequent to the involved interstate travel was "his communication to Ostrander to *terminate in advance* any attempt to commit any illegal activities in Pennsylvania." (Emphasis Griffin's.)

Without quite saying so, Griffin argues that no act illegal under Pennsylvania law was committed subsequent to the travel because the scheme was abandoned "in advance" of any horse actually being drugged, implying that leading a horse to drugged

water is permissible so long as one does not make him drink. Griffin's difficulty is threefold: (1) as above indicated, many if not all of Griffin's post-travel conversations were intended to further, not to terminate, the fraudulent scheme in Pennsylvania; (2) Griffin sent two horses[6] and his lieutenant to Pennsylvania after the travel and in furtherance of the scheme; and (3) it is sufficient that the travelers, under Griffin's pre- and post-travel direction, attempted in Pennsylvania to "promote . . . or facilitate the promotion . . . of any unlawful activity." 18 U.S.C. 1952(a).[7] The activity promoted, drugging race horses, was unquestionably unlawful under Pennsylvania law. 18 Pennsylvania Consolidated Statutes §§ 4109 and 7102.

 The government was not required to prove that either an actual or attempted drugging actually occurred. As the court stated in *United States v. Jones,* 642 F.2d 909, at 913 (5th Cir.1981):

> [T]he facilitating act in the other state need not be unlawful itself. As long as the interstate travel . . . and the subsequent facilitating act make the unlawful activity easier, the jurisdictional requisites under § 1952 are complete.[8]

**5.** 18 U.S.C. 1343 reads:
**Fraud by wire, radio, or television**
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**6.** Griffin says proof of shipping the horses was limited to hearsay testimony of Ostrander. Not so. Apart from the testimony's admissability as co-conspirators' statements under Rule 801(d)(2)(E), Fed.R.Evid., it was corroborated by proof that one of the shipped horses raced at Keystone and the other in New Jersey after the alleged shipments.

**7.** 18 U.S.C. 1952(a) reads:
**Interstate and foreign travel or transportation in aid of racketeering enterprises**
(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or

foreign commerce, including the mail, with intent to—
(1) distribute the proceeds of any unlawful activity; or
(2) commit any crime of violence to further any unlawful activity; or
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

**8.** Griffin cites *United States v. Zemater,* 501 F.2d 540, 544 (7th Cir.1974), for the proposition that his co-conspirators must actually have violated Pennsylvania law. That case, however, merely requires that the "unlawful activity" which a defendant promotes constitute a violation of the law of the State in which the promotion occurred. There, the defendants traveled to Saigon, Vietnam where conduct occurred which the government claimed violated Illinois law. The court held that the indictment should

■ The evidence was thus fully sufficient to support the conviction under Count V of the indictment.

### (c) Conspiracy

■ Griffin says his conspiracy conviction cannot stand because the evidence is insufficient to support his convictions on the substantive counts. The argument fails on two scores: (1) as above indicated, the evidence was not insufficient, and (2) the crime of conspiracy is an offense separate, distinct, and independent from the outcome on substantive counts properly brought. *United States v. Feola,* 420 U.S. 671, 694, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975); *Iannelli v. United States,* 420 U.S. 770, 777 & n. 10, 95 S.Ct. 1284, 1289 & n. 10, 43 L.Ed.2d 616 (1975); *Pinkerton v. United States,* 328 U.S. 640, 644, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946); *United States v. Ocanas,* 628 F.2d 353, 361–362 (5th Cir.1980); *United States v. Beil,* 577 F.2d 1313, 1315 n. 2 (5th Cir.1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979); *United States v. Carman,* 577 F.2d 556, 567 n. 12 (9th Cir.1978).[9]

### (2) Effective Assistance of Counsel

Griffin, of course, states this issue in terms of whether he was denied his Sixth Amendment right to effective assistance of counsel, asserting numerous failures (to object to hearsay testimony, to renew the motion for acquittal at trial's end, to move for suppression or object to introduction of Griffin's taped conversation with Ostrander, and to call a witness). At the threshold, however, the issue is more properly stated as whether effective assistance of counsel may be raised for the first time on direct appeal.

■ In *United States v. Stephens,* 609 F.2d 230, 234 (5th Cir.1980), a decision binding on this court,[10] it was reaffirmed that effective assistance of counsel may not be considered an issue before the court on direct appeal:

The law of this Circuit is that claims of inadequate representation cannot be determined on direct appeal where such claims were not raised before the District Court and there has been no opportunity to develop and include in the record evidence bearing on the merits of the allegations. *United States v. Rodriguez,* 582 F.2d 1015, 1016 (5th Cir.1978).

Recognizing, in a passing footnote, what he chooses to characterize as merely a "reluctance" of this court to consider the issue for the first time on direct appeal, Griffin says its consideration is appropriate when the claim does not depend on matters outside the record, citing *United States v. Payton,* 615 F.2d 922 (1st Cir.1980),[11] and where trial counsel's errors were "serious" and "egregious," citing *United States v. Aulet,* 618 F.2d 182 (2nd Cir.1980), *United States v. Kazni,* 576 F.2d 238 (9th Cir.1978), and *United States v. McCord,* 509 F.2d 334 (D.C. Cir.1974) *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

In *Payton,* the First Circuit disposed of the issue in two sentences, saying the claim must be presented to the district court in the first instance when it depends on matters outside the trial record, and citing *United States v. DeCoster,* 487 F.2d 1197

---

have charged that the illegal activity which followed the travel violated the law of the jurisdiction in which it occurred—namely, Saigon. The court in *Zemater* did not purport to decide whether a defendant actually had to commit an illegal act. Moreover, citation of *Zemater* for the proposition asserted is inappropriate in view of its specific rejection by the 5th Circuit in *United States v. Jones, supra,* 642 F.2d at 913 n. 6:

Although it seems clear in this circuit that the "thereafter" act need not be illegal in and of itself in the destination state, there is some precedent to the contrary in another circuit.

See *e.g., United States v. Zemater,* 501 F.2d 540 (7th Cir.1974).

**9.** Griffin cites *United States v. Irwin,* 654 F.2d 671 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982), but there, unlike here, the jury verdict may have been based on a substantive count that failed to state a crime.

**10.** *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

**11.** Griffin twice mis-cites *Payton* as a Fifth Circuit decision.

(D.C.Cir.1973). In the latter case, the court recognized that it did not "sit to second guess strategic and tactical choices made by trial counsel" and remanded for a hearing on the issue. In *Aulet,* the Second Circuit recognized the values in limiting effectiveness challenges to collateral attacks under 28 U.S.C. § 2255, and the difficulty of deciding the issue on what it called a "barren record;" the court nonetheless determined the issue against appellant because there was no doubt that Aulet failed to demonstrate ineffectiveness, because of judicial economy, and because both sides requested determination of the issue. In *Kazni,* the Ninth Circuit also recognized that "Claims of ineffective assistance of counsel are raised for the first time in collateral proceedings under 28 U.S.C. § 2255." The court went on to say that it had also recognized that failure of a trial court to note grossly inadequate representation sua sponte might rise to the level of plain error raiseable on direct appeal. The court then declined to reach the merits of the issue, saying nothing in the record on direct appeal indicated such plain error, and suggesting that any facts outside the record be presented in a § 2255 proceeding. In *McCord,* one of the cases spawned by what is now referred to as "Watergate," the D.C. Circuit elected to consider the claim under the "plain error" rubric "because of its seriousness and its intimate relation to the reputation and integrity of judicial proceedings" but went on to deny the claim.

Appellants have not fared well, even in the cases cited by Griffin, the courts having remanded the issue in one case, *DeCoster,* and having denied the claim and affirmed the conviction in all of the others.[12] Nor

has the disarray created by the implication that ineffectiveness may be raised for the first time on direct appeal under some circumstances (e.g., when supported by the record; when counsel's failures were egregious) served well the judicial process.

In contrast, the law of the Fifth, and now of this, circuit has long been clear and unequivocal. The straightforward statement in *Stephens, supra,* 609 F.2d at 234 ("Because this is a direct appeal, the issue is not properly before this court"), is but a shortened, and thus clearer, version of what had been said repeatedly by the Fifth Circuit in *Rodrigues, supra,* 582 F.2d 1016; *United States v. Prince,* 456 F.2d 1070 (5th Cir. 1972); *United States v. Hunter,* 417 F.2d 296, 297 (5th Cir.1969); *Ortega-Lira v. United States,* 406 F.2d 834, 835 (9th Cir.) *cert. denied,* 394 U.S. 964, 89 S.Ct. 1317, 22 L.Ed.2d 566 (1969); and *Moore v. United States,* 359 F.2d 852, 853 (5th Cir.1966).[13]

References to absence from the record of facts bearing on the merits of the allegations do appear in some of the Fifth Circuit opinions cited above. That is, however, but a concomitant of the absence of the issue's presentation to the district court. Because the issue was not presented to the district court, the record on appeal is necessarily inadequate to determine the merits of the allegations on that issue at the appellate level. From such references should not be drawn an implication that a particular record on appeal would warrant the appellate court in finding either effective or ineffective assistance of counsel. It is facts bearing on the precise issue that are needed and obtainable only after presentation to and determination by the district court.[14]

12. *Dyer v. United States,* 379 F.2d 89 (D.C.Cir. 1967) was cited in *McCord,* 509 F.2d at 351, n. 61. In *Dyer* the majority reversed for what it considered ineffective assistance of counsel, without mention, by the majority or by the dissent, of the question of whether the issue was properly before the court for the first time on direct appeal.

13. In view of this extended and consistent line of authority, it borders if it does not enter the arena of the frivolous to assert the issue for the first time on direct appeal.

14. If an appellate court elects to consider the issue and study the record on appeal in relation to it, an assertion of ineffective assistance may appear totally without merit in light of that record. The temptation is strong in such instances to go ahead and decide the issue against appellant on the presumption that doing so will reduce the workload of the district court. Succumbing to the temptation, however (1) adds unnecessarily to the workload of the appellate court; (2) may be fruitless, where the appellant would not have elected to present the issue to the district court under 28 U.S.C.

Moreover, once the record on appeal is plumbed for facts bearing on the issue, the damage to the judicial process is done. An election to decide whether the record on appeal is adequate for decision on the issue not only adds to the burgeoning workload of appellate judges in a particular case, but makes a mockery of the repeated statement that the issue may not be presented for the first time on appeal.[15]

To preclude, unequivocally and without cavil, presentation of the issue for the first time on appeal is not to deny the convicted an opportunity to present it. The rule does not deny presentation, it merely locates it. Indeed, in the cases cited above, the Fifth Circuit has repeatedly said it affirmed the conviction without prejudice to the right of appellant to raise the issue of ineffective assistance of counsel in proper proceedings available to him, on occasion specifying the availability of a proceeding pursuant to 28 U.S.C. § 2255, e.g., *Prince, supra,* 456 F.2d at 1071. In such a proceeding, appellant has a full opportunity to prove facts establishing ineffectiveness of counsel, the government has a full opportunity to present evidence to the contrary, the district court hears spoken words we can see only in print and sees expressions we will never see, and a factual record bearing precisely on the issue is created. If appeal be taken from the district court's judgment, an appellate court may decide on a record made on the precise issue.

Due process of law requires that we give full consideration not only to the interests of the convicted but also to the interests of the government and to those of the judicial process itself. The constitutional goal of establishing justice is not aided by the disregard of orderly procedure entailed in consideration of issues de novo on appeal. Where, as here, a perfectly adequate, indeed superior, judicial procedure agreeable to the Constitution has been established for presentation and determination of an issue, our duty to all of the interests involved lies not in devising or permitting a fugitive procedure of our own design but in requiring adherence to the procedure established.

The convictions are AFFIRMED.

§ 2255; (3) may deny appellant an opportunity to develop the issue on a proper record; (4) encourages future first-time presentations on appeal; and most importantly, (5) undercuts everything the courts of the Fifth Circuit have said against its presentation for the first time on direct appeal.

15. References to the record in some opinions have apparently led counsel for the United States to engage in unnecessary and time-consuming precautionary exercises. That happened here. Having firmly stated the law of this circuit precluding consideration of the issue for the first time on direct appeal (citing *Stephens*), government counsel, fearing to trust the court's adherence to precedent, devotes almost a third of appellee's brief to countering each of Griffin's allegations of ineffectiveness. Though this court could, on the present record, hold that Griffin failed to show ineffectiveness, for it to do so, as indicated in the text, would be to decide an issue not before us. The concept of judicial economy does not warrant determinations of issues not before the court; nor is adherence to that concept effective when, as here, economy in one case leads to waste in subsequent cases.