[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 23, 2006
THOMAS K. KAHN
CLERK

No. 04-15421
Non-Argument Calendar

_____

D. C. Docket No. 04-20032-CR-PAS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JULIO CAMACHO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(February 23, 2006)**

Before ANDERSON, BIRCH and HULL, Circuit Judges.

PER CURIAM:

After pleading guilty, Julio Camacho appeals his 120-month sentence for

conspiracy to possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. On appeal, Camacho argues that the district court clearly erred in denying him safety-valve relief.[1] After review, we affirm.

## I. BACKGROUND

### A. Offense

A confidential informant ("CI") for the Drug Enforcement Agency ("DEA") began negotiating by telephone with two Colombian individuals to sell them multiple kilograms of heroin. One of the Colombian individuals, known as Baretto or El Gordo, agreed to send his brother, Julio, and his brother-in-law, Lee Grant, to meet with the CI to complete the transaction. Thereafter, Camacho called the CI several times to arrange for the meeting.

On January 6, 2004, Camacho and Grant traveled from Orlando and met with the CI and an undercover DEA agent at a Miami restaurant to complete the transaction. During the meeting, Camacho, speaking in Spanish, handled the negotiations. When a disagreement arose about the terms of the deal, Camacho

---

[1]Camacho also raises for the first time in this Court a claim of ineffective assistance of counsel at sentencing. Because the record has not been adequately developed with regard to this claim, we decline to address it on direct appeal. See Massaro v. United States, 538 U.S. 500, 504-05, 123 S. Ct. 1690, 1694 (2003); United States v. Griffin, 699 F.2d 1102, 1107-09 (11th Cir. 1983).

insisted that his brother had told him that he was to pay $30,000 for 5 kilograms. Camacho explained that, because another individual who owed his brother money had not paid his debt, his brother had no more money at that time. Camacho also told them that his brother had a client waiting to purchase 5 kilograms. Camacho then assured them that "we're going to pay you next week" and that either he or his brother would bring the money. When the DEA agent suggested that Camacho should get only 3 kilograms, Camacho refused explaining "we're not going to come back" for more drugs. Grant, who did not speak Spanish, did not participate in these discussions except when the DEA agent and the CI gave him some directions in English.

Later that day, Camacho and Grant met again with the CI and the DEA agent and followed them to an undercover location. There, Grant handed the CI a bag containing $30,000 in exchange for five packages of sham heroin. Once Camacho and Grant began to pick up the packages, they were arrested. All of the telephone conversations and meetings were secretly recorded by the DEA.

**B.     PSI**

The presentence investigation report ("PSI") recommended a total offense level of 31 and a criminal history category I, which yielded a guidelines imprisonment range of 108 to 135 months. The PSI also indicated that the

statutory minimum sentence was 120 months and thus this caused the low end of the guidelines range to increase so that the range was 120 to 135 months' imprisonment. Camacho objected, arguing that he was entitled to safety-valve relief so that the sentence could be imposed without regard to the statutory minimum.

Camacho filed a safety-valve statement outlining his role in the drug deal. The main thrust of Camacho's statement was that he had never been involved in a drug deal before, that he was afraid and agreed only reluctantly to participate, that his job was merely to accompany Grant because he did not speak Spanish, and that he had said only what El Gordo, whom he also referred to as Cesar, had told him to say during the meetings. The government filed an objection to the safety-valve statement, claiming that Camacho had not fully disclosed all of the information concerning the drug deal. They also filed a videotape of the negotiations with Camacho and a transcript.

## C.    Sentencing

At the sentencing hearing, the district court heard extensive arguments for Camacho's safety-valve request, even continuing the hearing to review the evidence further. Upon reconvening, the district court concluded that Camacho's conduct during the negotiations was inconsistent with his claim that he was a first-

time drug dealer, as follows:

> Having gone through the review of the audiotape and reviewed the transcript again, I can see why the government finds that the statement is not truthful . . . . It is inconsistencies both in what is said on the tape when Mr. Camacho does not think that he is being recorded, and the inconsistencies with the . . . safety valve statement.
>
> It is also corroborated for me by the body language that I saw on the tape that just underscored for me either Mr. Camacho is the world's best actor that is worthy of an Academy Award, or else . . . this wasn't his first time, []he knew what he was involved in, and he was negotiating on behalf of an entity that he was familiar with.
>
> The particular things that jumped out at me were the changes in the discussion between the $30,000 and the desiring to take five kilograms away from the deal. He says in his safety that he was concerned, he was afraid, he had never done anything like this before. But both the contents of the transcript as well as seeing the videotape, shows a man who is very much in charge as between himself and Mr., is it Grant, Lee Grant, Shondale Lee Grant? – that the understanding was that Mr. Grant did not speak Spanish, and in fact neither the undercover nor the CI had – the CI, had spoken to Mr. Grant in English to give him directions. So the rest of the conversation was governed and led by Mr. Camacho. And it does not show any timidity or reluctance or pause in Mr. Camacho's negotiations there.

The court then asked Camacho under oath for clarification regarding the identity of Boretto, El Gordo and Cesar. Camacho explained that all these names referred to the same person. Camacho also stated that, while he referred to this person as his brother and his cousin, he was not a blood relative, but a younger friend, with whom he had grown up and who now lived in Colombia. Camacho explained that Cesar, whom he had suspected of being in the drug trade, phoned him in January from Colombia to set up the drug deal. The court then questioned,

5

"Can you explain how you took the phone call of someone that was three years younger than you calling from Colombia to tell you to drive down from Orlando to Miami to accompany drugs?  It just doesn't make common sense . . . if in fact you had never done this before and were afraid."  Camacho replied that Cesar knew that Camacho had legal problems and offered to help him.

Then the government elicited from Camacho, that he: (1) knew that Boretto had someone who was going to buy the five kilograms of heroin; (2) negotiated when the money would be paid; and (3) never consulted Lee, who was present at the meeting and the "experienced" drug dealer.  Camacho reiterated that he only said what he was told to say, he was nervous and did not know what to answer, and he was only responding to the agents.  Finally, Camacho stated that he only became involved in the drug operation because of Cesar, as a one-time way to make $5,000.

The district court replied:

Mr. Camacho, the difficulty that I have is that you say that your total involvement in this was a phone call from somebody that you knew in Colombia . . . . you suspected that he was in the drug trade, he calls you up on January 5th and tells you, according to you, that he wants you to go with Mr. Grant, whom you say you have met only one time before, and to go with Mr. Grant who has the $30,000 to take them down to Miami to pick up the drugs; that Mr. Grant can't speak Spanish, and so you are there to provide Spanish interpretation, and then when I see the tape and read the transcript of the tape you are the one that is taking the lead in all of the discussions . . . . [M]y common

6

sense is telling me that I am not hearing a full and truthful disclosure .
. . .

The district court specifically found that it could not grant safety-valve relief because: (1) Camacho had "not been as forthcoming as he should be"; and (2) he had not satisfied his burden to "truthfully convey[] the facts of his knowledge about this offense." The court then sentenced Camacho to 120 months' imprisonment, the statutory minimum for Camacho's drug offense.

## II. DISCUSSION

Camacho claims that the district court clearly erred in denying him safety-valve relief because his statement was internally consistent and comported with the record. We disagree.

Under the safety-valve provisions of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, a sentencing court may depart downward from the statutory minimum sentence if the defendant, among other things, gives the government prior to the sentencing hearing truthful and complete information concerning the offense or offenses that were part of the same course of conduct. United States v. Simpson, 228 F.3d 1294, 1304-1305 (11th Cir. 2000); 18 U.S.C. § 3553(f)(5); U.S.S.G. § 5C1.2(a)(5). "The question of whether the information [that the defendant] supplied to the government . . . was truthful and complete . . . is a factual finding for the district court." United States v. Brownlee, 204 F.3d 1302, 1305 (11th Cir.

7

2000). "The burden of proof on the truthfulness issue lies, of course, with the defendant." United States v. Espinosa, 172 F.3d 795, 797 (11th Cir. 1999). We review a district court's factual determinations in deciding whether to grant safety-valve relief for clear error. United States v. Cruz, 106 F.3d 1553, 1556-57 (11th Cir. 1997).

We find no clear error here. The district court went to great lengths to evaluate Camacho's credibility, questioning Camacho under oath about the details of his safety-valve statement and continuing the hearing to give the court time to review the tapes and transcripts more carefully. After doing so, the district court found that Camacho was not truthful, noting particularly the inconsistency between Camacho's claim that he was an inexperienced, one-time drug dealer and the confident way in which Camacho conducted himself during the actual transactions. The record supports the district court's credibility finding, showing that Camacho took the lead during the negotiations rather than merely acting as an interpreter for Grant, insisted on the amount and price, and gave guarantees for payment and an explanation for why the entire amount of cash was not available. Because the district court made specific, detailed findings, supported by the record, that Camacho was not credible in his safety-valve proffer, it was not clear error for the district court to deny safety-valve relief.

8

Accordingly, we affirm Camacho's 120-month sentence.

**AFFIRMED.**